**Christopher BUCKLEY, Plaintiff,**

**v.**

**McGRAW–HILL, INC., d/b/a Business Week, Defendant.**

**Civ. A. No. 87–1582.**

United States District Court, W.D. Pennsylvania.

Sept. 30, 1991.

9. *Id.*

John P. Yukevich, Jr., Pittsburgh, Pa., for plaintiff.

Frederick N. Egler, Jr., Egler, Garrett & Egler, Pittsburgh, Pa., for defendant.

## OPINION

DIAMOND, District Judge.

Christopher Buckley has filed a diversity suit against McGraw Hill, Inc., a New York corporation which owns and publishes *Business Week* magazine. Buckley alleges that an August, 1986 article published in *Business Week* contained statements or implications that were false and defamatory. He alleges that the statements were delib-

erately designed to convey the impression that he was incapable and incompetent to perform in the position for which he was hired at Allegheny International ("AI"), that his father, the former Chief Executive Officer of AI, had created the position for him to enable him to live in unearned luxury, and that his being employed by AI created a damaging conflict of interest. Buckley also alleges that the statements placed him in a false light in the eyes of the public.

*Business Week* has moved for summary judgment. For the reasons that follow, the motion for summary judgment will be granted.

### Background

*Business Week*'s cover story in its August 11, 1986 edition was entitled "Big Trouble at Allegheny." (See Exhibit A, attached to this opinion). The article focused on what it termed the "questionable management practices" at AI. Much of the article concerned the activities of AI's then Chief Executive Officer, Robert Buckley, Christopher Buckley's father. The portions of the article at issue in the present lawsuit discussed AI's employment of Christopher Buckley at a company-owned hotel, the Dover.

Buckley challenges a number of statements and alleged implications contained in the August, 1986 article. The article included the following statements:

> Sons and daughters of senior [AI] executives were placed on the payroll—including one of the chairman's sons, who was appointed manager of a Manhattan hotel that AI owned. He was then allowed to live in the hotel's penthouse, which had been renovated with marble bathrooms, elaborate paneling, and other luxuries at a cost of more than $1 million.

. . . . .

> The company paid nearly $6 million for a Manhattan hotel; Buckley's son became its manager, although his qualifications were minimal. [This statement was contained in a highlighted box titled "Did

Conflicts of Interest Cloud Executive Judgment?"]

. . . . .

AI is straining to escape from a series of ill-fated real estate ventures. One of these, the Dover Hotel in midtown Manhattan, has raised apparent conflict of interest questions. AI originally purchased the hotel for $5.7 million in 1982, planning to convert it into a time-sharing residence. That plan proved to be unrealistic when AI belatedly learned what heavy sums it would have to pay rent control tenants to move out. So the company began renovating the building for use as a hotel, starting with the penthouse, where it spent more than $1 million dollars installing marble bathrooms and an elaborate rooftop greenhouse. The first resident of the refurbished penthouse: Buckley's son Christopher. Even though former executives say that Christopher had no hotel experience, Buckley installed him as manager of the Dover. Christopher declined to comment....

Buckley contends in his complaint that the statements about him in connection with his employment at the Dover, independently and cumulatively, are false and defamatory when given their plain and natural meaning in the context of the article. He asserts that the August, 1986 article constituted an extreme departure from the standards of investigative reporting ordinarily adhered to by responsible reporters, editors, and publishers. Buckley alleges that *Business Week* published the article in a negligent manner, with reckless disregard for the truth or falsity of its statements, and with malice.

*Business Week* has moved for summary judgment on the ground that Buckley has failed to make a showing sufficient to establish essential elements of his prima facie case, including defamatory content, falsity, and fault. We heard arguments on this motion on May 22, 1991.

### Discussion

■ Prior to evaluating the merits of Buckley's claims, we must determine what

law governs this action. The issue is whether to apply the substantive law of New York or of Pennsylvania. Buckley initially argued to the court that Pennsylvania law should control this action. *Business Week* consistently has urged the application of New York law. The parties now agree that Buckley's claims should be adjudicated under the substantive laws of the State of New York. We also conclude that the substantive law of New York should be applied to Buckley's claims, not simply because the parties have stipulated that we should do so, but because factors independent of the parties' stipulation support the application of New York law to the issues in this case.

In a diversity case, a federal court applies the choice of law rules of the state where the court is sitting. *Klaxon Company v. Stentor Electric Manufacturing Company,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Under the choice of law rules of Pennsylvania, courts engage in a two-part inquiry. First, it must be determined whether the laws of the states with an interest in the case conflict. If they do, it must be determined which state has the greater interest in the particular question at issue. *Myers v. Commercial Union Assurance Companies,* 506 Pa. 492, 496, 485 A.2d 1113, 1116 (1984). The conflict is resolved through an analysis of the policies and interests underlying the particular issue before the court. 506 Pa. at 496, 485 A.2d at 1115, *citing Griffith v. United Airlines,* 416 Pa. 1, 203 A.2d 796 (1964).

The two states with a particular interest in this case are Pennsylvania and New York. These states appear to differ on the appropriate standard of fault which would apply under the facts of this case. As we conclude below, this case involves a private figure who seeks to recover for statements about a matter of public concern. Under New York law, private figures may recover against media defendants for statements about a matter arguably within the sphere of legitimate public concern only on a showing that the publisher acted in a grossly irresponsible manner. *Chapadeau v. Utica Observer–Dispatch,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 64, 341 N.E.2d 569, 571 (1975). The Pennsylvania Superior Court has held that a private figure in Pennsylvania may recover damages for defamation upon a showing of mere negligence. *See Rutt v. Bethlehems' Globe Publishing Co.,* 335 Pa.Super. 163, 484 A.2d 72, 83 (1984).[1] Because New York and Pennsylvania courts differ on the applicable standard of fault, we must apply the law of the state with the greater interest in this case.

The question of whether Pennsylvania or New York has a greater interest in this case is a close one. The Pennsylvania courts provide little guidance because they apparently have not applied Pennsylvania choice of law rules to resolve a conflict of law problem in the context of a defamation suit.

Pennsylvania's interest is mainly founded on Buckley's relationship with the Commonwealth. Buckley grew up in Pennsylvania and is a Pennsylvania domiciliary.

---

**1.** We note that prior to the Superior Court's decision in *Rutt,* the Court of Appeals for the Third Circuit stated that Pennsylvania's standard of liability for suits brought by private figure plaintiffs was unsettled. *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 272 (3d Cir. 1980); *see also Rutt v. Bethlehems' Globe Pub. Co.,* 335 Pa.Super. at 189, 484 A.2d at 85 (Beck, J., concurring and dissenting). In *Matus v. Triangle Publications, Inc.,* 445 Pa. 384, 286 A.2d 357 (1971), *cert. denied,* 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972), the Pennsylvania Supreme Court adopted as binding a rule announced by a plurality of the United States Supreme Court in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). Under this rule, any plaintiff must prove that defendants published false material with knowledge of its falsity or with reckless disregard of the truth. The United States Supreme Court subsequently held that private figure plaintiffs could recover upon a showing of mere negligence. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Pennsylvania Supreme Court has not revisited the question of whether a private figure plaintiff must show more than mere negligence. The standard of fault under Pennsylvania law accordingly is not entirely settled. We will assume that Pennsylvania requires a lesser standard than New York.

His family was living here when the August, 1986 article was published. Both he and his family now live in the Commonwealth, although we note that Buckley lived in Florida when he filed this lawsuit.

New York also has a substantial interest in this case. Buckley lived and worked in New York at the time the August, 1986 article was published. The Dover Hotel, the center of the controversy, is located in New York. *Business Week* is a New York corporation, with its principal place of business in New York. The August, 1986 article was edited in New York.

Finally, although we do not consider this a compelling factor, New York courts have expressed New York's interest in protecting media defendants. The New York Court of Appeals has in the context of a defamation action articulated New York's particular interest in providing a hospitable climate for the free exchange of ideas. *Immuno AG v. Moor–Jankowski*, 77 N.Y.2d 235, 249, 566 N.Y.S.2d 906, 913, 567 N.E.2d 1270, 1277 (1991), *cert. denied*, — U.S. —, 111 S.Ct. 2261, 114 L.Ed.2d 713 (1991). The court stated that the expansive language of the free speech guarantee of the New York Constitution, the history in New York of a free press, and the consistent tradition in New York of providing the broadest possible protection to the gathering and dissemination of news of public events, all call for particular vigilance by New York courts in safeguarding the free press against undue influence. *Id.* Courts applying New York law have held that libel is less plaintiff-centered than other torts. *Davis v. Costa–Gavras*, 580 F.Supp. 1082, 1093 (S.D.N.Y.1984); *see also Zerman v. Sullivan & Cromwell*, 677 F.Supp. 1316 (S.D.N.Y.1988). The District Court for the Southern District of New York has noted strong policy reasons for deciding issues whose major impact is on the behavior of potential defendants according to the rules of the jurisdiction where the conduct that gives rise to the liability takes place, especially when that conduct may be protected speech. *Davis*, 580 F.Supp. at 1093.

In addition to the above factors, we also consider the fact that, on May 28, 1991, the parties filed a "partial pretrial stipulation" agreeing that New York law should control. Based on the typescript of this pleading, it appears to have been drafted by Buckley. The stipulation provides, in pertinent part, that:

> the parties are in agreement that no genuine conflict of laws exists in applying the substantive laws of the State of New York to Plaintiff's claims in the above captioned action under the choice of law rules of the Commonwealth of Pennsylvania and agree that Plaintiff's claims should be adjudicated under the substantive laws of the State of New York.[2]

■ Both Pennsylvania and New York have a strong interest in this case. Under traditional choice of law analysis, the state where the plaintiff is domiciled generally, but not always, will be deemed to have the greater interest in a defamation case. *See* Restatement (Second) of Conflicts § 150(2), which provides that "when a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship *usually* will be the state where the person was domiciled at the time, if the matter complained of was published in that state." (emphasis added). However, we find that Pennsylvania's interest in protecting its domiciliary is decreased somewhat in this case by virtue of the fact that by stipulating to the application of New York law its domiciliary Buckley has elected to give up the protections of Pennsylvania law. The fact that Buckley did not reside in Pennsylvania at the time the August, 1986 article was published or at the time he filed this lawsuit

---

**2.** We are not sure what the parties mean by the statement that "no genuine conflict of laws exists in applying the substantive laws of the State of New York ... under the choice of law rules of the Commonwealth of Pennsylvania." If they mean that there is no conflict between how Pennsylvania and New York law would apply in the present case, the parties quite likely are wrong. As discussed above, Pennsylvania and New York require differing levels of fault on the part of the publisher. If there were no conflict between Pennsylvania and New York law, it would be irrelevant which state's law we applied.

also tends to diminish Pennsylvania's interest in this case.

In addition, we note that there is some authority for applying the law agreed to by the parties entirely or in substantial part because they have so agreed. The Court of Appeals for the Third Circuit has stated in the context of a defamation action that it had no cause to challenge parties' consensual choice of Pennsylvania law inasmuch as Pennsylvania "has *an interest* in the outcome of this litigation." *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 269 (3d Cir.1980) (emphasis added). Pennsylvania's interest in *Steaks Unlimited* was that "the allegedly defamatory acts as well as the subject of the disputed broadcast occurred in Pennsylvania." The plaintiff, which was not a natural person but a corporation, was based in Ohio. The Court of Appeals for the Seventh Circuit has gone further, holding that litigants can, by stipulation, formal or informal, agree on the substantive law to be applied to their case, within broad limits. *See City of Clinton, Ill. v. Moffitt,* 812 F.2d 341, 342 (7th Cir. 1987).

Given New York's strong interest in this case, and the fact that the parties have agreed and stipulated that New York law is to be applied, we conclude that New York has the greater interest in this case. We will apply New York law.

■ Buckley cannot prevail on his defamation claim unless he can establish three things under New York law.[3] First, he must show that statements or implications contained in the August, 1986 article were reasonably susceptible of a defamatory meaning. *Mahoney v. Adirondack Publishing Co.,* 71 N.Y.2d 31, 523 N.Y.S.2d 480, 482, 517 N.E.2d 1365, 1368 (1987). Second, he must show that the defamatory statements were false. *Id.* Finally, he must show that *Business Week* acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties. *Chapadeau v. Utica Observer–Dispatch, Inc.,* 379 N.Y.S.2d at 64, 341 N.E.2d at 571.

In its motion for summary judgment, *Business Week* attacks all three of these essential elements of Buckley's claim. *Business Week* argues that Buckley cannot establish that the statements he complains of are capable of defamatory meaning and contends that Buckley's interpretation of the article includes forced and unintended innuendo. *Business Week* also argues that there is no genuine material issue of fact as to whether the challenged statements are substantially true. Finally, *Business Week* argues that there is no genuine material issue of fact as to whether *Business Week* was grossly irresponsible in publishing the statements.

■ At the outset we must decide whether the challenged statements are capable of defamatory meaning and whether they are capable of the meaning ascribed to them by Buckley. *Antonetty v. Cuomo,* 131 Misc.2d 1041, 502 N.Y.S.2d 902, 906 (1986). In making this determination, we may not isolate the challenged statements but must consider them in context. *Weiner v. Doubleday & Company, Inc.,* 74 N.Y.2d 586, 550 N.Y.S.2d 251, 253, 549 N.E.2d 453, 455 (1989), *cert. denied,* 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 498 (1990). Further, the statements must be tested against the understanding of the average reader. *Aronson v. Wiersma,* 65 N.Y.2d 592, 493 N.Y.S.2d 1006, 1007, 483 N.E.2d 1138, 1139 (1985).

■ Under New York law, a statement is defamatory if it "tends to expose a person to hatred, contempt, or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community, even though it may impute no moral turpitude to him." *Tracy v. Newsday, Inc.,* 5 N.Y.2d 134, 182 N.Y.S.2d 1, 3, 155 N.E.2d 853, 854 (1959). A statement also is defamatory if it tends to disparage a person in his profession or trade. *Id.*

In his complaint, Buckley asserts that seven specific statements or implications in the 1986 article are substantially false and untrue. We now examine each of these

---

**3.** Buckley also must establish other matters not now at issue, such as publication.

statements to determine whether they are susceptible of a defamatory meaning. We also examine the alleged implications to determine whether each is susceptible of a defamatory meaning and also capable of the meaning ascribed to it by Buckley.

 Buckley asserts first that the statement or implication that he was installed as the hotel manager of a luxurious Manhattan hotel is substantially false. The August, 1986 article does include this statement. However, we conclude that this statement is incapable of defamatory meaning. The statement that Buckley was the manager of a luxurious hotel would not tend to expose him to hatred, to contempt, or to aversion. Nor would such a statement tend to disparage Buckley's conduct in his profession. Insofar as the use of the verb "installed" may contribute to an implication that Buckley benefitted from nepotism, its use may, in the context of the article, be capable of defamatory meaning. We address the implication of nepotism below.

 Buckley next objects to the statement or implication that the Dover was a luxurious Manhattan hotel being operated as such while he worked and resided there. Regardless of whether the article states or implies that the Dover was luxurious, a statement that a person has some attachment to a luxurious hotel in no way exposes that person to hatred, contempt or aversion. Similarly, an implication that the Dover was being operated as a hotel would not prompt anyone to think of Christopher Buckley in evil or unsavory terms. Such statements or implications are incapable of defamatory meaning.

 Buckley next contends that the article states or implies that the Dover was purchased by Allegheny International or Robert Buckley in order to provide Buckley with a job and luxurious residence. The article includes no such statement. Nor, we find, may such a conclusion fairly be implied from the article. The average reader would not conclude that AI or Robert Buckley acquired a six million dollar piece of property for the purpose of creating a job and a luxurious apartment. An average reader would surely realize that if the goal were to locate a position for Christopher Buckley, this goal could be achieved without going to such lengths as purchasing an expensive building in New York City and undertaking its renovation.

 Buckley next objects to the statement or implication that he was "allowed to live" in the hotel's luxurious penthouse. The article does include this statement. However, once again, statements as to one's residence in a luxurious penthouse are incapable of defamatory meaning. To the extent that the statement may contribute to an implication that Buckley benefitted from nepotism, we discuss it below.

 Buckley next objects to the article's statement or implication that the penthouse was renovated at a cost of one million dollars. While the article includes such a statement, it is hardly susceptible of a defamatory meaning. Statements as to the amount of money expended in renovating a penthouse do not expose the occupant of the penthouse to hatred, aversion, or contempt. Nor do such statements tend to disparage a person in his profession.

 Buckley next objects that the article states or implies that plaintiff was unqualified to work as a construction manager at the Dover. The article states that "former executives say that Christopher had no hotel experience...." There is no material question of fact as to the truthfulness of this statement. Christopher Buckley had no hotel experience. The article also states that "[Buckley's] qualifications were minimal." We will presume for purposes of this summary judgment motion that this statement is capable of defamatory meaning. We also presume that this statement is a statement of fact, not opinion.

 Buckley also objects to the statement or implication that Allegheny International's employment of Buckley presented a conflict of interest. The article does fairly imply that Buckley's employment presented a conflict of interest. This implication is capable of defamatory meaning with re-

gard to Buckley only insofar as it implies that he was a beneficiary of nepotism.

Buckley also contends that a fair reading of the article would lead a reader to believe that Allegheny was struggling financially, partly as a result of Robert Buckley's purchase of and refusal to sell the Dover for the ₊urpose of employing his son as hotel manager and providing him with a lavish penthouse. As set forth above, we reject the assertion that the article fairly implies that the Dover was purchased in order to provide Buckley with a job. We similarly do not believe that an average reader would interpret the article to mean that AI retained the Dover in order to maintain Christopher Buckley's position and penthouse.

We are left with two statements or implications which we will presume are capable of defamatory meaning: the statement that Buckley was minimally qualified to work as a manager at the Dover and the imp₋cation that Christopher Buckley benefitteɔ' from nepotism. With regard to the implication of nepotism, we will presume that the article implies that Buckley got his position at the Dover and a luxurious place to live because of his father.

 *Business Week* asserts that it is entitled to summary judgment on the ground that there is no question of material fact as to whether the challenged statements or implications are substantially true. For purposes of this motion we will presume that there are material questions of fact as to whether the statements or implications as to nepotism and to Buckley's qualifications are substantially true.

 Where the content of an article is arguably within the sphere of legitimate public concern, which means reasonably related to matters warranting public exposition, a defamed party may recover damages only on a showing of gross irresponsibility. Determining what editorial content is of legitimate public interest and concern is a function for editors, subject only to review by the courts to protect against clear abuses. *Gaeta v. New York ˙News Inc.*, 62 N.Y.2d 340, 477 N.Y.S.2d 82, 85, 465 N.E.2d 802, 805 (1984).

 Allegations of nepotism which question the integrity and credibility of high corporate officials raise a matter of legitimate public concern. *See Tavoulareas v. Piro*, 817 F.2d 762 (D.C.Cir.1987) (en banc), *cert. denied*, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). The real subject of the August, 1986 article was Christopher Buckley's father, Robert Buckley. As the chief executive officer of a publicly held company with thousands of shareholders, Robert Buckley clearly was a high corporate official. That he may have hired a minimally qualified person to fill a responsible position because that person happened to be his son is a matter of public concern, particularly in light of AI's financial problems at the time. It also is significant that the Securities and Exchange Commission was then examining executive compensation at AI.

Under New York law, Buckley can recover only if those statements or implications in the *Business Week* article that are both false and capable of defamatory meaning were published in a "grossly irresponsible" fashion, without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties. *Chapadeau v. Utica Observer–Dispatch, Inc.*, 379 N.Y.S.2d at 64, 341 N.E.2d at 571. Buckley has come forward with no evidence showing facts which would justify a jury in concluding that *Business Week* acted in a grossly irresponsible manner. *Business Week* has submitted evidence which shows that, to the contrary, the magazine did not act in a grossly irresponsible manner.

According to the uncontradicted evidence, at least two sources told the principal reporter, William Symonds, that Robert Buckley put Christopher Buckley into the position at the Dover. Symonds testified at deposition that he was told that "Buckley put his kid up there." According to *Business Week*'s brief, this source was Dick Phillips, AI's director of corporate real estate. Symonds also stated that Thomas Maletta, a former vice president at AI, told him that "[Buckley] was put in."

According to Symonds, Maletta made this statement in the context of explaining that Christopher Buckley had no experience. The obvious implication of Maletta's statements was that Christopher Buckley got the position at the Dover because of his father.

Symonds also stated that he was told by Dick Hellwig, a former AI vice president of finance, that Christopher Buckley was ill-qualified to run this operation, speaking of the Dover Hotel. In addition, Symonds averred that he was told by Thomas Maletta that Buckley had no experience and was very unqualified for the job he was given. Another source, apparently Al Thomas, a former real estate official at AI, told *Business Week* that Buckley had no qualifications for the job.

■ Under New York law, a publisher acts recklessly if it should have had serious doubt as to the truth of a publication. *James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 386 N.Y.S.2d 871, 877, 353 N.E.2d 834, 840 (1976). In other words, it must be established that there are obvious reasons to doubt the veracity of the report. *Id.* The facts as provided by *Business Week*'s sources had inherent plausibility and the reporters had no obvious reason to doubt the veracity of the information. It was inherently plausible that Christopher Buckley was put into the position of manager, or "construction manager," of the Dover by his father. Christopher Buckley was a young man in his 20's, a recent college graduate with little to no relevant work experience. It is undisputed that he heard about the position at the Dover from his father. When at least two apparently knowledgeable sources clearly implied that Robert Buckley put his son into the position, the implication had inherent plausibility.

■ The statement that Christopher Buckley had minimal qualifications also was inherently plausible. Again, Christopher Buckley was a young man with little work experience. When several sources attested to his lack of qualifications, their statements were inherently plausible. There were no obvious reasons to doubt the veracity of these statements.

We conclude that no triable issue is raised as to *Business Week*'s gross irresponsibility. *See Gaeta v. New York News, Inc.*, 477 N.Y.S.2d at 86, 465 N.E.2d at 806. In fact, we are not sure what else *Business Week* could have done to be more responsible. *Business Week* vigorously sought a response from Christopher Buckley prior to publication of the August, 1986 article. Buckley declined to respond. In addition, the magazine specifically asked Robert Buckley, in writing, about the Dover Hotel. Robert Buckley refused to discuss the matter.

With respect to his defamation claim, Christopher Buckley has failed to come forward with evidence sufficient to raise a triable issue of fact as to whether *Business Week* satisfied its duty of care. Nor can Buckley prevail on his "false light" claim. *See Arrington v. New York Times Company*, 55 N.Y.2d 433, 449 N.Y.S.2d 941, 434 N.E.2d 1319 (1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 994 (1983). Accordingly, *Business Week*'s motion for summary judgment will be granted.

1052

BRAZIL THE THIRD WORLD SUCCESS STORY PAGE 48

COMPUTER MAKERS, THAT ARE BEATING THE SLUMP PAGE 22

# BusinessWeek

AUGUST 11, 1986 A McGRAW-HILL PUBLICATION $2.00

# TROUBLE!

Robert Buckley, CEO of Allegheny International, runs a very ailing company. It lost $109 million last year, it is mired in debt, and its stock is near a 10-year low. That is bad enough. But in the course of a three-month investigation, Business Week has uncovered well-documented instances of questionable business practices. They include: lavish spending on executive perks, conflicts of interest, and limited disclosure to shareholders. What's going on here? PAGE 56

EXHIBIT A

# BusinessWeek

NUMBER 2959 AUGUST 11, 1986

IN 1985, WHEN LOSSES HIT $109 MILLION, ALLEGHENY INTERNATIONAL SPENT NEARLY $1 MILLION ON THIS HOUSE TO ENTERTAIN CLIENTS

PHOTOGRAPH ON COVER BY ANDREW POPPER. PHOTOGRAPH ABOVE BY JIM JUDGE

## Cover Story

**56 BIG TROUBLE**
Five corporate jets, a $1 million guesthouse, 2% loans for executives—the perks stayed lavish at Allegheny International even as business went from bad to dismal. The worst blunders: oil, gas, and real estate deals—highly risky plays shareholders were told little about. Even so, Chairman Buckley was paid handsomely. AI has prominent outside directors. Where were they when all this was happening?

**60 LEAKY ROOF**
Allegheny's real estate woes

## Top of the News

**22 GLIMMERS OF GOOD NEWS**
The computer slump isn't over—but some companies are bouncing back

**24 AFTER THE TAX CONFERENCE**
The middle class may be in for a nasty surprise

**25 BUSINESS LOSES**
The House is winning most of the tax-conference battles

**25 COMMENTARY**
Why Washington should stop killing agriculture with kindness

**26 MAKING THE SWITCH**
Now, France has to get its joint venture with ITT to work

**27 NO MORE RIDING THE RAILS?**
Santa Fe's two lines could both go on the block

**27 DIGGING AMAX OUT**
How CEO Allen Born is stemming the mining giant's losses

**28 NEW BLUE-JEAN KING**
Lee and Wrangler join up

**29 MAXICARE NEVER FELT BETTER**
It is now the giant of HMOs

**30 OIL-PATCH BARGAIN?**
Freeport couldn't resist Petro-Lewis

**34 IN BUSINESS THIS WEEK**
Jefferson Smurfit, Standard Oil, the Hunts, Weyerhaeuser, toxic waste, Fruehauf, the Reichmanns, LTV

## Economic Analysis

**14 ECONOMIC WATCH**
When charitable giving drops off

**16 ECONOMIC DIARY**
The GNP, job growth, productivity, Japanese labor costs, producer prices

**19 BUSINESS OUTLOOK**
Now the lagging economy has a new obstacle—higher interest rates

## International

**38 BRAZIL**
It's fast becoming an industrial powerhouse

**40 A TALK WITH JOSE SARNEY**
Ending the 'inflationary mentality'

**41 ASIA**
South Korean and Taiwanese exports are booming

**44 TAIWAN**
And now, a Ford from Taiwan

**45 BRITAIN**
A bailout plan at Lloyd's

CHAIRMAN BUCKLEY MADE MASSIVE, HIGHLY RISKY DEALS IN OIL, GAS, AND REAL ESTATE—AND TOLD SHAREHOLDERS LITTLE ABOUT THEM

# BIG TROUBLE AT ALLEGHENY

## LAVISH PERKS, POOR INVESTMENTS—AND A BOARD THAT LET IT HAPPEN

In early 1985 a dummy corporation set up by Allegheny International Inc. purchased a magnificent Tudor home in one of Pittsburgh's best neighborhoods for $450,000. The bill for furniture, draperies, and crystal almost matched the purchase price, say former executives. Many employees were astonished by such spending in a year when AI lost a record $109 million. A senior executive told a colleague that one reason for the purchase was the lack of a decent hotel in Pittsburgh for entertaining directors and important clients.

The expense—less than $1 million—was not a huge sum for AI. The company manufactures Sunbeam and Oster appliances and had sales of $2.1 billion last year. But the fancy guesthouse is not an isolated case. It is typical of the extravagant way of doing business at AI over the past five years. What's more, the extravagance continued even while stockholders watched the price of their shares tumble by as much as 70%.

AI provided its top executives with a lavish lifestyle and extraordinary benefits. Among the perks: a fleet of five jets (dubbed the "Allegheny Air Force" by insiders) and more than $30 million in personal loans available at 2% interest. Sons and daughters of senior executives were placed on the payroll—including one of the chairman's sons, who was appointed manager of a Manhattan hotel that AI owned. He was then allowed to live in the hotel's penthouse, which had been renovated with marble bathrooms, elaborate paneling, and other luxuries at a cost of more than $1 million.

Worst of all, Chairman Robert J. Buckley steered the company into massive but highly risky real estate and oil and gas deals while telling shareholders little about the investments. Far afield from AI's mainstream businesses, these investments were fraught with poor business judgments and even conflicts of interest that seemed to benefit company officers rather than AI's owners—the shareholders. In one case, AI bought

controlling interest in a troubled Florida condominium project in which Buckley and other top executives owned units (page 60). The purchase came after Buckley complained bitterly about repairs he needed. The huge risks in real estate and oil and gas ventures became clear only last year, when AI reported almost $100 million of pre-tax losses in those areas.

A three-month effort by a team of BUSINESS WEEK reporters and editors uncovered a pattern of questionable management practices at AI. Besides reviewing public documents, BUSINESS WEEK looked at some AI expense accounts and other internal documents and interviewed more than 30 former and present managers and executives, as well as past board members. Most requested anonymity.

BUSINESS WEEK repeatedly requested interviews with company executives and directors and submitted written questions. On July 30, AI said that no interviews would be granted. It said an earlier story "demonstrates an extremely negative bias to the company" (BW—May 19). AI also said some of the questions asked by BUSINESS WEEK touched on areas covered in a current Securities & Exchange Commission inquiry. The company's review has shown that the questions from BUSINESS WEEK are not justified, AI said. The company's auditor, Peat, Marwick, Mitchell & Co., also declined comment.

**TIGHTENING THE SCREWS.** The AI board, which former directors say has shown little independence, is under intense pressure from creditors and shareholders to clean house. AI's banks recently forced it to sign a tough new loan agreement that gives lenders effective control over many strategic decisions. The SEC is looking into AI's executive compensation, benefits, entertainment expenses, use of corporate aircraft, and certain real estate transactions. Several large shareholders are openly critical. And the New York Stock Exchange is threatening to delist AI if its financial condition fails to improve.

The behavior of AI's management is all the more extraordinary in light of the company's financial results. Since 1981, when AI reported earnings of $81 million on sales of $1.6 billion, profits have fallen steadily, culminating in last year's loss. Meanwhile, shareholders' equity has plunged 81%, to $85.7 million. The common-stock dividend has been eliminated, and the company lost $1.8 million in the second quarter. AI's shares recently traded at about 15, far below the high of 55 reached in 1981.

Management theory has it that strong outside directors are the best protection

shareholders have. AI's deterioration, though, has taken place despite a board that includes prestigious outsiders. Among them: Anthony J. F. O'Reilly, CEO of H. J. Heinz Co.; Alexander M. Haig Jr., the former Secretary of State; Richard M. Cyert, the president of Carnegie-Mellon University; Jean-Jacques Servan-Schreiber, the French author; Anthony J. A. Bryan, chairman of Copperweld Corp., and Mark H. McCormack, agent and investment adviser for well-known sports figures.

Not all the directors, however, can be considered completely independent overseers. One of the nine outside directors on the 14-man board is George T. Farrell, president of Mellon Bank. Mellon is the lead bank for the group of banks that has imposed the new loan agreement on AI. Three other outside directors have received money from the company beyond their normal directors' fees. A fourth, Spencer R. Stuart, founder of InveQuest Inc., a Dallas marketing and investment firm, received large commissions prior to becoming a director in 1984, former executives say.

AI's shareholders are increasingly restive. One of them, Horace J. DePodwin, the retired dean of Rutgers State University's Graduate School of Management, calls AI a textbook example of how even a star-studded board cannot be relied on to protect shareholders. DePodwin, now a professor of business policy at Rutgers, bought stock about two years ago. Since then, he has become disillusioned, and he recently fired off a letter to board members. "I respectfully suggest to the board that Allegheny appears to be out of control," he wrote. "For the company to survive, an abrupt change is required in the extent of control exercised by the board, including control over corporate assets and management." Buckley met with DePodwin to answer the charges, but DePodwin says the answers were unsatisfactory.

**A RISING STAR.** To understand AI, you must first know its boss. The company is undeniably the creation of the ambitious 62-year-old Buckley. He grew up in New York, earned a law degree at Cornell University, and gained his first extensive business experience at General

## THE ISSUES HAUNTING ALLEGHENY INTERNATIONAL

▶ **WAS SPENDING ON EXECUTIVE PERQUISITES TOO LAVISH?**
As financial problems mounted, AI maintained a fleet of five corporate jets—including a $15 million Gulfstream III. Executives lived well and entertained grandly. Some say they even took pleasure trips overseas at company expense. AI spent $1 million to buy and furnish a splendid Tudor home in Pittsburgh and $500,000 on a resort condominium beside an exclusive golf course.

▶ **DID CONFLICTS OF INTEREST CLOUD EXECUTIVE JUDGMENT?**
After Chairman Robert Buckley and other officers purchased condominiums in a troubled Florida project, AI bought a controlling interest—against the advice of its real estate unit. The company paid nearly $6 million for a Manhattan hotel; Buckley's son became its manager, though his qualifications were minimal.

▶ **WERE ACCOUNTING PROCEDURES PROPER?**
Former executives charge that travel not related to business could be billed to the company, and executives might never be required to provide a business justification for the expense. The executives add that records on the use of company planes were sometimes kept deliberately vague.

▶ **DID SHAREHOLDERS GET ENOUGH INFORMATION?**
Board member Alexander M. Haig Jr., former Secretary of State, receives consulting fees of $50,000 annually from the company. His contract was not mentioned in the company's proxy material. Last year, AI reported pretax losses of nearly $100 million in its energy and real estate businesses. Those losses came as a surprise to some shareholders, who complain that the company provided almost no information about the ventures.

▶ **WHERE WAS THE BOARD OF DIRECTORS?**
AI's 14-person board includes prominent directors from outside the company. Yet even as financial results worsened, former directors say, Buckley encountered no significant resistance from his board. One problem may have been that four of the nine outside directors either have received or are receiving payments for work done for the company.

## Cover Story

Electric Co. In nine years he rose to manager of union relations of the Schenectady (N. Y.) plant. He once said: "I went up in that company like my last name was Electric."

Buckley later ran Standard Steel, now partly owned by AI, and was president of Ingersoll Milling Machine Co. In 1972 he went to Allegheny Ludlum Industries Inc., a Pittsburgh-based specialty-steel producer looking for new blood. Three years later he was the boss. Already, Buckley had concluded that steel offered little future. He sold off the specialty-steel operations to its managers in 1980 and moved into consumer businesses by acquiring Wilkinson Sword Group Ltd. and Sunbeam Corp. By 1982 the rechristened Allegheny International had sales of $2.6 billion. almost three times the figure when Buckley became chairman. He predicted revenues would hit $5 billion as early as 1986.

**ARTS PATRON.** This success, combined with Buckley's considerable personal charm, helped him dominate his expanding empire, according to former executives. Those who dared to challenge the chairman risked quick dismissal. His sway extended to the board room. "Buckley ran it like his own show," recalls one former director. Key issues were discussed, says another former director, "but I didn't see the controversy I did on other boards."

Buckley, a music lover who once aspired to a career as an opera singer, became a prominent figure in the Pittsburgh arts scene. AI made large donations to the arts, especially the Pittsburgh Symphony Society, where

Buckley was president. He planned an elaborate new corporate headquarters to crown a renewal of Pittsburgh's cultural district.

AI was also acquiring a reputation within Pittsburgh corporate circles for providing its top executives with a regal lifestyle. The company, which has operations worldwide, acquired a fleet of jets. Buckley once pointed out that he travels 330,000 mi. a year, mostly on a company Gulfstream III reserved for his use. AI held annual management meetings in such places as Boca Raton, Fla., and the Bahamas. They involved up to 100 executives and spouses flown in from around the world and sometimes cost hundreds of thousands of dollars. At one Florida gathering, an ice carving graced the banquet. It cost about $10,000, according to one key former executive.

While such perks are hardly unique, record-keeping at AI was often lax, and a culture began to emerge in which some top executives began to take extraordinary liberties. Two former executives told BUSINESS WEEK that they were allowed to take weekend vacations to Washington and London—charging everything to company accounts. These bills never appeared on their personal expense reports. Others say that corporate jets were sometimes used for such personal reasons as visiting vacation homes and taking families on trips and that the nature of those flights was not always accurately recorded. According to one well-placed former executive, the "Allegheny Air Force" was pressed into service to ferry guests to the wedding of one of Buckley's children. BUSINESS

WEEK could not determine whether Buckley reimbursed the company.

Three former AI officers say that they had serious questions about high expenses submitted by an Christopher Lewinton, a London-based executive vice-president and board member who has since left the company. Lewinton declined to respond to BUSINESS WEEK's questions. It is not clear whether the expenses were disallowed.

**MORGAN'S CELLAR.** In another case, an elaborate wine cellar was installed in Buckley's home by an AI subsidiary, now known as Bally Engineered Structures Inc. Three former executives say that the company paid bills for the purchase or shipment of wine for this cellar. According to one of these executives, more than $100,000 was spent to buy part of a wine collection that once belonged to J. P. Morgan. BUSINESS WEEK could not determine whether the company was reimbursed. Two former executives contend that the company paid for the wine cellar, but Buckley's son John, who works for Bally, says that his father repaid the company. BUSINESS WEEK has learned that the expense has been questioned by the SEC.

As AI's financial condition worsened, some executives began to doubt the propriety of continued high living. "There is no question we were living way beyond our means," says one former officer. Raymond S. Fries, a former executive vice-president, says of the posh management meetings: "We could have had the same meetings in Pittsburgh without the enormous expense."

But AI didn't change its free-spending

THE FINANCIAL DILEMMA AT ALLEGHENY INTERNATIONAL

PROFITS HAVE TUMBLED... ...WHILE THE DEBT BURDEN MOUNTS... ...AND WALL STREET SHUNS ITS STOCK

ways. Only a few months before buying the Tudor home in Pittsburgh, the company acquired a condominium in the resort country near Ligonier, Pa. The condominium is on the Rolling Rock estate, which is still controlled by the Mellon family, and backs onto what is one of the nation's most exclusive golf courses, Rolling Rock Club. Former executives say the total cost of this acquisition, including furnishings, came to roughly $500,000. Even though Buckley described the condominium's function as a place to entertain visiting dignitaries, it has been frequently used as a vacation retreat for Buckley and his family, the former executives say.

Such spendthrift habits help explain why overhead at AI is so high Headquarters and other corporate expenses, for example, amounted to $50.7 million, or 2.5% of sales, last year. That's down from 3.2% of sales two years earlier. But William H. Miller of Legg Mason Wood Walker Inc., which owns a sizable block of AI stock, says expenses still are "grossly in excess of any reasonable amount that needs to be spent." Miller says that comparisons with similar companies show that AI should be spending half as much.

**MARBLE BATHS.** SEC documents suggest that the company is taking a closer look at expenses. AI's 1986 proxy, sent to shareholders in March, revealed that the company is now counting personal airplane use as compensation and paying taxes on the imputed income for employees Executives say at least one of the planes is up for sale.

Meanwhile, AI is straining to escape from a series of ill-fated real estate ventures. One of these, the Dover Hotel in midtown Manhattan, has raised apparent conflict-of-interest questions. AI originally purchased the hotel for $5.7 million in 1982, planning to convert it into a time-sharing residence. That plan proved to be unrealistic when AI belatedly learned what hefty sums it would have to pay rent-control tenants to move out. So the company began renovating the building for use as a hotel, starting with the penthouse, where it spent more than $1 million installing marble bathrooms and an elaborate rooftop greenhouse.

The first resident of the refurbished penthouse: Buckley's son Christopher. Even though former executives say that Christopher had no hotel experience, Buckley installed him as manager of the Dover. Christopher declined to comment.

Despite AI's financial pinch—and even with the investment of well over $10 million in the Dover providing scant income—Buckley rebuffed at least one potential buyer for the hotel. However, an agent working for AI says the hotel will be sold this fall, perhaps at a profit.

The company's elaborate new headquarters building is another example of Buckley's grand style. The building, which is going up in the midst of Pittsburgh's cultural district, is to be a 32-story granite tower that "will have a

## A STAR-STUDDED BOARD

**A**llegheny International assembled a blue-chip group of 9 outside directors on its 14-member board. Among the prominent outsiders are (left to right) former Secretary of State Alexander Haig; Richard Cyert, president of Carnegie-Mellon University; Anthony O'Reilly, CEO of H. J. Heinz; and Jean-Jacques Servan-Schreiber, a French commentator and internationalist.

higher standard of quality than anything Pittsburgh is accustomed to," says an official of its developer, Lincoln Property Co. But AI, which is slashing its corporate staff to around 250 from 450 in 1984, needs far less space than it committed to at $26.50 per sq. ft. under the lease-back arrangement put in place to obtain financing.

AI has managed to sublease some of this space to Consolidated Natural Gas Co., but only by agreeing to charge CNG $6.50 a sq. ft. less than what AI is paying for the primary lease. As a result, AI's spending on corporate office space could double, to some $5 million when it moves in. To add insult to injury, the new building will be called CNG Tower. not AI Tower, as originally planned.

AI's biggest real estate loss, however, came in Houston, where it owned a 34-story office building known as Phoenix Tower. Problems here started with the terms of the joint-venture deal, under which AI had to put up all of the cash while giving partner Albritton Development Co. half the equity. Construction didn't get under way until late 1982, after oil prices had already started plunging. To compound these problems, former executives say, AI passed up an opportunity to sell the building—when it was nearing completion in late 1983—at

a price that would have enabled the company to recoup most of its original $30 million investment. Instead, AI allowed the building to stand vacant almost two years at a carrying cost of $1 million a month. AI finally sold the building to Sears, Roebuck & Co.'s Homart Development Co. late last year for $47 million, writing off more than $40 million. "They had a lot of opportunities to do better," says a veteran Houston real estate agent, "but they were asleep at the wheel." This debacle was the key reason that AI's realty unit lost $62.3 million last year. But the losses may not be over. Despite the write-offs, AI disclosed that it has been forced to guarantee $114.5 million of debt incurred by the realty subsidiary.

AI also drilled a dry hole in the energy business, where it began investing in 1981. It pumped more than $30 million into an oil-and-gas-drilling venture sponsored by Houston-based Halbouty Energy Co. Though AI had virtually no oil and gas expertise, Buckley was enthusiastic, former executive Fries says, and the board went along. It was a decision they came to regret. As oil prices plunged last year, an appraisal found that reserves were far lower than estimated. AI was forced to take a $32.2 million loss on the venture and stop investing in oil and gas.

**SAFETY NET.** This big energy loss, combined with the bloodbath in real estate, "came as a surprise to most people," says Gregory M. Drahuschak, a Butcher & Singer analyst. The reason: AI's mention of these investments had been so brief in its reports that, analysts say, it was nearly impossible to fathom the risk being assumed.

Even while AI's executives were sowing the seeds of their financial problems, their level of compensation was stirring discussion in Pittsburgh corporate circles. In 1984, when it earned a paltry $14.9 million, AI paid Buckley over $1 million in cash, more than the chiefs of two much larger Pittsburgh companies, Westinghouse Electric Corp.'s Douglas D. Danforth and USX Corp.'s David M. Roderick. Last year, AI's heavy losses hit home, and Buckley's cash compensation plunged to $573,100, largely because he didn't earn a bonus. However, within the first three months of 1986, the board gave Buckley the chance to make up the difference by granting him the option to buy 140,000 shares of AI stock, more than 1% of the corporation's outstanding shares, at an average price of

## Cover Story

$17.88, close to the low for the decade.

Executive salaries at AI have been supplemented by millions of dollars loaned at a 2% interest rate. Although such programs are often used by companies to help executives acquire stock, $10.4 million of the $32.3 million in outstanding loans to AI executives was used for other things. "That is unusual as hell," says Jude Rich, president of Sibson & Co., a New Jersey-based compensation consultant.

Children of top executives also benefited from AI's employment practices. Sharon Sweeney, the daughter of Clayton A. Sweeney, then vice-chairman, was hired as head of investor relations in 1985. Although bright, she brought little experience to the post at a time when major shareholders were already unhappy. Besides Christopher, two more of Buckley's sons are on the corporate payroll. Executives who worked with them say both are well qualified.

**$10,000 A DAY.** Where was the AI board while all this was happening? One possible explanation for its passivity and relative generosity is that a number of outside directors have financial ties to the company. Furthermore, AI has been inconsistent in letting shareholders know about these relationships. When Haig joined the board in 1983, for example, Buckley offered him an arrangement under which he is paid $50,000 for providing advice "in the area of safety and protection devices" no more than five days a year. The arrangement was first disclosed in a copy of the agreement attached to AI's 1984 annual report filed with the SEC. There has been no mention of the arrangement in proxy materials mailed to shareholders. Meanwhile, a part-time employment agreement reached in 1983 with Lord Fanshawe, former head of Wilkinson Sword, was not mentioned in the proxy until this year. Whether or not such disclosures were legally required by the SEC, shareholders—in principle—should have been promptly and fully informed, Professor DePodwin says.

This year's proxy also disclosed that two consulting firms with which Director Mark H. McCormack is associated were paid $163,000 for work done for AI in 1985. Former executives say also that Director Stuart received substantial payments for helping set up some of AI's real estate deals before he joined the board in 1984. Stuart couldn't be reached for comment.

How much the board knew of what was happening at AI is difficult to determine. Former board members say that the board did receive information on the oil and gas and real estate investments, though two directors say they cannot recall any board discussion of the company's highly questionable purchase of an interest in the Florida project in which Buckley owned condo units. Most boards do not typically review spending on travel and entertainment or use of executive jets. But the board did support Buckley's biggest gamble: the 1981 decision to pay $534 million for Sunbeam, far more than offered by rival bidder IC Industries Inc. The bid was based on an overly optimistic assumption by AI executives about future performance of the small-appliance business.

**FAULTY PROJECTIONS.** When these assumptions failed to materialize, the costs of servicing the heavy debt acquired in Buckley's restructuring began to cut deeply into earnings. Nevertheless, the board continued to support a management that was issuing wildly optimistic predictions. In early 1985, Graemer K. Hilton, then president of AI, said in a letter to shareholders that "the corporate restructuring is essentially complete," adding that we "anticipate an overall improvement in operating profit in 1985." Instead, operating earnings plunged from $63.7 million in 1984 to last year's loss of $57.5 million, and AI was forced to embark on a drastic program of selling assets to cut debt.

Buckley is now 'saying he plans to shrink the company to sales of $1.5 bil-

---

# HOW A LEAKY ROOF MAY COST ALLEGHENY DEARLY

*I run a large company and am not a difficult man to get along with, but I promise you that if I take legal action I will not relent. If it takes $5 million, I will stop the project....It would please me to do it for my friends, who are exasperated beyond belief.*

That was the threat from Robert J. Buckley in a letter on company stationery to the manager of his Florida condominium when it needed repairs in 1981. Within a year, Allegheny International Inc., the company that Buckley heads, had bought controlling interest in the condominium project and a big chunk of another Florida real estate development. AI has yet to see a dollar of profit from the $16 million still sunk in the two projects.

The Florida forays were not AI's most costly gaffes in real estate. But the projects, where top executives also had financial stakes, provide striking evidence of how conflicts of interest tainted corporate decisions.

Buckley's problems involved a devel-

opment called La Mer, a community of flat-topped concrete condominiums on a site featuring a 1,000-ft. strip of seashore in Vero Beach. Buckley bought three units at La Mer and said that he "was instrumental in bringing a number of people into the property." Many of them were AI executives, including

LA MER: BUCKLEY FOUGHT OVER CONDO REPAIRS, THEN AI TOOK CONTROL OF THE PROJECT

Vice-Chairman Clayton A. Sweeney, President Graemer K. Hilton, and Executive Vice-President Alan H. Anderson, all of whom have since left AI. Some AI executives invested as a group in still another unit.

Buckley was not a happy owner, as he recounted in a deposition taken last

TAYLOR/BLACK STAR

THE DOVER HOTEL: BUCKLEY INSTALLED HIS SON CHRISTOPHER AS THE MANAGER AND PUT HIM IN A $1 MILLION PENTHOUSE

lion, focusing on its Sunbeam appliances and other consumer lines. But the margin for error is shrinking, too In May officials of the New York Stock Exchange met with executives to discuss whether AI's stock should be delisted Among other things, AI no longer met the exchange's requirement that a company's tangible assets available for holders of common stock must exceed the company's liabilities by at least $8 million. AI had a deficit of $118.4 million at the end of last year.

Also hemming in AI is the new bank agreement, signed on Apr. 29, which commits the company to a strict schedule for repaying debt and places harsh restrictions on the payment of both common and preferred dividends. "The company is now backed into a damn near impossible corner," contends analyst Eric Billings, a Johnston, Lemon & Co. analyst. Indeed, in a desperate bid to meet the terms imposed by creditors, Buckley is now selling off some of the consumer businesses that represent the company's greatest hope for the future.

Consider the case of Rowenta-Werke, a leading European producer of such appliances as toasters and irons that was half owned by AI. Buckley faced a dead-

line of June 29 for paying off $30 million of its bank credit. AI had launched a stock-rights offering in late May to raise money, but the issue had to be withdrawn within days because of shareholder complaints that it would only dilute the stock. With the company already forecasting a second-quarter loss, the only option was to sell assets. So he scrambled to sell the company's stake in Rowenta to Chicago Pacific Corp.

**NO MERCY.** The sale of Rowenta, which had sales of $265 million last year, was a crushing blow to Buckley's dream of making AI the world leader in small appliances. Even more ominous, however, was the financial loss. By mid-June, Buckley had signed a letter of intent to

sell Rowenta to Chicago Pacific for at least $80 million, sources close to the deal say. But Chicago Pacific was well aware of AI's situation and, days before the bank deadline, told Buckley that it would have to lower the price. To make matters worse, Rothmans Deutschland, which owned the other half of Rowenta, balked. As a result, for equal shares of Rowenta, Rothmans received $40 million and AI $34 million.

The outside directors are theoretically the shareholders' last line of defense. Yet Farrell, as president of Mellon Bank, is in a key position in the banking syndicate that is trying to lay claim to AI's assets. At the same time, Farrell is responsible for preserving those assets for shareholders. Farrell declined to discuss the Rowenta deal.

The sad fact is that the Rowenta deal may not be the last time that Buckley accepts less than top dollar for AI assets. Come December, the company must reduce its debt load by an additional $150 million. After all of the mistakes at Allegheny International, it may be too late to hope that shareholder interests will come first.

*By William C. Symonds in Pittsburgh, with bureau reports*

---

year as part of a lawsuit against the developer, Mackle Development Corp. Buckley told how one of his units had a leaky roof, a rusty stove, and a damaged bathtub. He said he had so little success in getting repairs that his wife "was getting sick, and I just took matters into my own hands." In early 1981, Buckley sent the manager the letter threatening legal action.

Shortly thereafter, AI's real estate unit was asked to study La Mer as an investment. In August, President Thomas P. Maletta issued a scathing report that advised steering clear. La Mer did not meet "specific standards we were looking for in terms of ROI [return on investment] and internal rate of return," Maletta said in a deposition. Nevertheless, that fall, AI bought controlling interest in La Mer.

Buckley testified that he played no significant role in the decision to proceed, attributing the idea to Maletta. Maletta's denial that he urged making the investment was corroborated in another deposition by AI General Counsel James T. Dougherty. Two former AI executives told BUSINESS WEEK that Buckley ordered the investment.

Eventually, AI, acting through its limited partnership that controlled La

Mer, sued Mackle to force its removal as developer. AI achieved its goal last year, but only by paying Mackle $1.5 million to settle the suit. Not counting legal costs, AI has invested about $9 million in La Mer and a vacant piece of land next door.

**GOOD ON PAPER.** That vacant land indirectly got AI into trouble on the other side of the state. AI's fellow investor in the land was Rodney L. Propps, who was planning a development called The Oaks near Sarasota. Propps envisioned a sprawling community of 900 spacious homes. Plans called for two golf courses, a dozen tennis courts, and an imposing clubhouse that featured a double-spiral staircase ascending to the grand ballroom. On the AI executives' visits to Florida, Propps quickly learned that they "enjoyed their junkets," as one of Propps's business associates puts it. Propps was soon obliging the AI brass with deep-sea fishing trips. In 1982, AI bought into the first phase of Propps's project, called Oaks I, as a partner. A partnership that included Maletta and AI Executive Vice-President Raymond S. Fries invested in Oaks I at the same time.

When the second phase of the project, Oaks II, came along, AI invested in

that as well. But AI executives became unhappy with the progress of the development and managed last year to sell the company's interest to Propps for $9 million and get repayment of $25 million it had lent him. The transaction put AI in a position to make a profit from Oaks II, but there was a hitch. AI lent $7 million to Propps as part of the deal, and the loan is now tied up in the Chapter 11 bankruptcy proceeding initiated by Oaks II last year.

At the largely deserted Oaks II, the clubhouse—with its dining room tables still set for the next meal—is closed. The golf course is closed, too, its putting greens turning brown under the blistering sun. Oaks I, which is not in bankruptcy and is located just across the road, is in immaculate shape. But since Oaks II has most of the recreational facilities, the fortunes of investors in Oaks I depend heavily on whether the companion project can be rescued. Fries, who is no longer with AI, says he figures that the money the executives invested in Oaks I "is gone, and I have little hope of recovering even 50¢ on the dollar." AI seems to be in the same boat.

*By William C. Symonds in Pittsburgh, with Pete Engardio in Sarasota*

---