Allen WILSON

v.

Michelle SLATALLA, et al.

Civil Action No. 95–8039.

United States District Court,
E.D. Pennsylvania.

June 18, 1997.

---

Marc I. Rickles, Kardos, Rickles, Sellers & Heley, Newtown, PA, for plaintiff.

Marc J. Zucker, Mann, Ungar, Spector, Labovitz, P.C., Philadelphia, PA, Slade Rich Metcalf, New York City, for defendants.

### MEMORANDUM OF DECISION

RUETER, United States Magistrate Judge.

Presently before the court are defendants' motion for summary judgment and plaintiff's response thereto. For the reasons that follow, this court orders that defendants' motion for summary judgment be granted in part and denied in part.

Plaintiff, Allen Wilson, filed this claim against defendants Michelle Slatalla, Joshua Quittner, and HarperCollins Publishers, Inc. In his Complaint, plaintiff alleges that defendants Slatalla and Quittner made a number of defamatory statements about him in a non-fiction book entitled *Masters of Deception: The Gang That Ruled Cyberspace* (the "Book"),[1] which they co-authored. (Complaint, at Counts I and II). Plaintiff further avers that defendant HarperCollins defamed him by publishing and distributing the Book. (Complaint, at Counts III and IV). Defendants moved for summary judgment in this matter, with affidavits and exhibits in support thereof, claiming that the statements in the Book concerning the plaintiff are not capable of defaming plaintiff, are not defamatory because they are substantially true, and, even if defamatory, some of the statements are covered by the fair report privilege. (Document No. 14). For the reasons that follow, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

### I. BACKGROUND

#### A. *Facts*

Plaintiff is a domiciliary and resident of Pennsylvania. (Complaint, at ¶ 2). Defen-

---

**1.** The Book was subsequently republished in paperback form. (Pl. Resp., Exhibit K (Quittner Depo.), at 136).

dants Slatalla and Quittner are residents of New York and defendant HarperCollins is a Delaware corporation with a principal place of business in New York. (Complaint, at ¶¶ 3–5). In January 1995, defendant Harper-Collins published the Book which relates the story of a group of computer hackers, of which plaintiff was a member, who called themselves the Masters of Deception, or MOD (hereinafter "MOD"). (Def. Mem. Summ. J., at 2). Throughout his affiliation with MOD, plaintiff was known by the handle "The Wing." (Wilson Depo., at 81). Members of MOD, including plaintiff, on numerous occasions, used their computer skills to gain unauthorized access to private computer systems. (Quittner Aff., at ¶ 8; Wilson Depo., at 94–95). Federal authorities investigated the activities of MOD and ultimately five members of the group were indicted in the United States District Court for the Southern District of New York for various crimes involving the illegal use of computers. (Quittner Aff., at ¶ 9). Plaintiff was not prosecuted in the case, but was deemed an unindicted co-conspirator. *Id.* Plaintiff cooperated with the government in connection with the prosecution of the indicted co-conspirators. *Id.*

Plaintiff claims that the Book severely tarnished his reputation. Although he is not one of the main characters of the Book, plaintiff is referenced on numerous occasions throughout the Book in connection with the activities of MOD and its members. The alleged defamatory statements relate to plaintiff's participation in the computer-related activities of the group, and the government investigation of plaintiff's involvement in the group. (Pl. Resp., at 2).

### B. *The Alleged Defamatory Statements*

In his Complaint, plaintiff alleged that the following passages were defamatory in nature. (Complaint, at ¶ 13). For organizational purposes, the court will utilize the defendants' categorization of these statements.

1. *Statements Relating to the Eye Center Computer ("Passage No. 1")*

The "worthwhile project" that Paul and Allen had undertaken was this: they were invading a private computer and programming it to find long-distance calling card numbers. It seemed victimless to them. They needed the numbers to fund calls to further their education. Who was being hurt? Not the person whose calling card number got used, because that person would dispute the bill and never have to pay. Not the phone company, because the filched phone calls emanated from a reservoir of limitless capacity. It was like riding the rails. The trains were running anyway, and a hobo wouldn't displace any cargo in the boxcar.

This is how the hack worked. Allen procured the phone number for a computer in the back room of the Eye Center, which stores and updates computer records. And if you must know, it's where he gets his glasses. Paul doesn't ask Allen how he got the number.
(pp. 73–74).

\* \* \*

Paul and Allen needed calling card numbers because they did a lot of long-distance dialing. To each other, for starters. A call from Queens to Pennsylvania is a long-distance call, and who can afford that twice a night? They called out-of-state bulletin boards as well.

This went on for months, through the summer and fall of 1989. Paul and Allen shared their "side-benefits" with Eli and other friends. In all, the Eye Center computer found about 150 valid calling card numbers. That was a lot of free long-distance calls you could make. That was thousands of dollars' worth of service that ITT wouldn't collect a penny for. The boys in MOD didn't stop to think about it, really, but there were people who might say this was more than just a prank.

The Eye Center hack got so sophisticated that the boys rigged Allen's computer to dial Eli's beeper with each new ITT number.
(pp. 74–75).

2. *Statements Relating to the Crash of the Learning Link Computer ("Passage No.2")*

A day or so later, Allen and Eli have a three-way phone call with Paul at college. They tell him what happened.

Paul feels kind of sick. For some reason Paul can't figure out, Allen and Eli are laughing about it. Even Paul laughs a little bit at first, although he can't explain why. But it makes him uneasy. (p. 96).

3. *Statements Relating to the January, 1990 Searches of MOD Members' Homes ("Passage No. 3")*

Days later they had gone to meet The Wing, which wasn't able to talk for too long since he was too busy. He had been anticipating this little visit for a while, though. His dad didn't exactly like the idea of their presence and kicked their lack-of-warrant asses out before they got a chance to put to use their years of interrogation techniques classes. Seems they think he showed his teacher a credit report or something.... (p. 122).

4. *Statements Relating to the 2600 Meeting and the Tower Book Store Incident ("Passage No. 4")*

It's the first Friday of the month, and most of the MOD boys are at the *2600* meeting. Allen's here, visiting for a few days.... Suddenly, the hackers rush the pay phones in Citicorp, and in each little carrel, they launch a mass attack. Everyone dials the same Texas phone number: Comsec's 800 line. (p. 161).

\* \* \*

After eating, the boys wander across Third Avenue to Tower Books, where they flip through the endless shelves of hardcovers. Allen sees a phone receiver hanging on the wall and starts fiddling. It's the store's internal intercom system, and it can't make calls outside the building. But with a device he happens to carry, Allen coaxes a dial tone out of the receiver and immediately places a call to a friend in Pennsylvania. The device he uses is a tone dialer, which emits a noise that simulates the sound a pay phone would recognize as coins dropping into a slot. It works like a bird call for computers. It was a pretty good hack, you'd have to admit, until all of a sudden a security guard comes over. He starts hassling them, wondering why some scruffy kid is fooling around with the store's phone. At that point, things take on the flavor of a segment from the Keystone Kops. Hackers scramble for the store's exit, more security guards appear from nowhere, and Allen is right in the middle of it. Then another hacker gets this bright idea to spray a Mace-like substance into the air as if it is air freshener. The hackers are pumped now, and they rush out into the New York City night. Nobody gets caught. They have a good laugh about it. (p. 162).

5. *Statements Relating to the Dot–Annoy Computer Program ("Passage No. 5")*

First, log on to Allen's Unix computer. Then leapfrog over to the Apple computer that's hooked up to it.

Next, pick a lamer who deserves a taste of dot-annoy.

Find his name in the database.

Call up the lamer's entry and execute the dot-annoy program. It's easy. This will instruct the Apple computer to follow the simple software program that Allen wrote. (pp. 162–63).

\* \* \*

The MOD boys could get really cute and add refinements to the torture. One twist is called "Mr. Ed." Invoke Mr. Ed, and Allen's computer would call the target and speak directly to him. Allen's computer, which has audio capability, would blare out, "Hel-l-l-l-o, Wil-l-l-l-l-bur!" over and over. (p. 164).

6. *Statements Relating to Unauthorized Access of Computer Systems of Credit Reporting Services ("Passage No. 6")*

John, Julio, Allen, and Eli have become fascinated by the possibilities of TRWnet for reasons that are different from Mark's. (p. 185).

\* \* \*

One day on the phone Allen and John talk about whether another friend, named Matt, has gotten a TRW manual to help them.

"Did you talk to Matt? Did you ever find out how to put the delinquencies on?" asks Allen. (p. 185).

7. *Statements Relating to the Wrongful Acquisition of Laptop Computers and E-mail Messages ("Passage No. 7")*

Allen Wilson's two-story, single-family home on Moon Drive in Fallsington, Pennsylvania, was also included. In the search warrant application, the Secret Service told the judge that the MOD boys had said during a phone conversation that Allen had stolen two laptop computers. The Secret Service also told the judge that Allen had told John of stealing electronic mail messages meant for Chris Goggans.

(p. 201).

8. *Statements Relating to the Criminal Proceedings and Wilson's Cooperation with Law Enforcement Officials ("Passage No. 8")*

Allen's a really helpful guy. Sure he is. Look at him making these annoying trips from Pennsylvania to Manhattan whenever the prosecutor called. Allen's family hired a lawyer to accompany him.

The other boys heard that his lawyer had put together a nice deal for Allen. That Allen was cooperating against his friends. The feds were grateful, the other MOD boys hear. Allen's information was helping build a stronger case against them. (pp. 203–04).

\* \* \*

And Julio? He and Allen were the only ones who didn't get jail sentences.

(p. 222).

9. *Statements Relating to Wilson's Possible Involvement in Group Known as The Posse ("Passage No. 9")*

The Net has virtually no security. It makes Tymnet look like a fortress. So it wasn't hard for The Posse to capture thousands of users' passwords before system administrators noticed the break-ins. Nobody knows what this new generation of hackers has in mind, but it sounds ominous. Plus, the modus operandi sounds familiar, so familiar, that the FBI paid a visit to Allen recently. Of course, Allen wasn't charged with anything. Just an informational visit, you understand.

(p. 223).

## II. STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) provides that if "there is no genuine issue as to any material fact ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden of showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the moving party sustains its burden, the non-moving party must then "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir.1992). The "non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact," *Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 511 (3d Cir.1994), or replace "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990). In assessing whether the non-moving party has met its burden, the court must focus on both the materiality and the genuineness of the factual issues raised by the non-movant. An issue is "genuine" only if there is sufficient evidence from which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* at 248, 106 S.Ct. at 2510. A factual dispute is only "material" if it might affect the outcome of the case. *See id.* A dispute over irrelevant or unnecessary facts will not preclude summary judgment. *Id.*

When considering a motion for summary judgment, the court must draw inferences in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the evidence of the non-movant must be taken as true. *See id.* at 255, 106 S.Ct. at 2513–14. The court may not make credibility determi-

nations or weigh the evidence. *Id.* at 252, 106 S.Ct. at 2512. If the record thus construed could not lead the trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

### A. Choice of Law

This court must first consider what substantive law is to be applied to the facts of this case. Defendants contend that the substantive law of New York is applicable. Plaintiff, however, argues that Pennsylvania law governs the present issue. Because this is a diversity case, this court will apply the choice of law principles of Pennsylvania. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *LeJeune v. Bliss–Salem, Inc.,* 85 F.3d 1069, 1071 (3d Cir.1996). The first step in the choice of law analysis is to determine whether a conflict exists between the defamation laws of New York and Pennsylvania. If a conflict does indeed exist, the court must then weigh the competing state interests and policies and apply "the law of the state having the most significant contacts or relationships with the particular issue." *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964).

■ This case involves a private figure plaintiff who seeks to recover for alleged defamatory statements about a matter of public concern. It is undisputed that plaintiff is a private figure. (Def. Mem. Summ. J., at 26; Pl. Resp., at 25). The Supreme Court has held that whether a statement involves a matter of public concern must be determined by its "content, form, and context ... as revealed by the whole record." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761, 105 S.Ct. 2939, 2946, 86 L.Ed.2d 593 (1985) (plurality opinion) (quoting *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690–91, 75 L.Ed.2d 708 (1983)). In addition, the Third Circuit has described a matter of public concern as "a real dispute, the outcome of which affects the general public or some segment of it." *E.H. McDowell v. Paiewonsky,* 769 F.2d 942, 948

(3d Cir.1985) (citing *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296 (D.C.Cir.), *cert. denied,* 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980)). In light of these standards, this court concludes that the present issue encompasses a matter of public concern. The Book, written in non-fiction format, recounts the story of a group of computer hackers who used illegal means to access the computer systems of major corporations. Specifically, the alleged defamatory statements in the Book concern the ability of the MOD members to breach the security and threaten the integrity of large computer systems. Particularly with the emergence of the Internet, such topics and related issues have come to the forefront of public debate. *See e.g. American Civil Liberties Union, et al. v. Reno,* 929 F.Supp. 824 (E.D.Pa.1996), *probable jurisdiction noted by,* —— U.S. ——, 117 S.Ct. 554, 136 L.Ed.2d 436 (1996) (suit challenging provisions of Communications Decency Act of 1996 that restricted certain communications over computer networks); Note, *Keeping Secrets in Cyberspace: Establishing Fourth Amendment Protection for Internet Communication,* 110 Harv. L.Rev. 1591 (1997). Arguably, the Book contributes to "robust debate on public issues", and is not a matter of "private pique". *See Matus v. Triangle Publications, Inc.,* 445 Pa. 384, 398, 286 A.2d 357, 365 (1971), *cert. denied,* 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972).

■ The laws of New York and Pennsylvania differ, however, on the appropriate standard of liability in a defamation suit such as the case at bar. The United States Supreme Court established a minimum constitutional standard of proof for defamation suits brought by private figure plaintiffs, irrespective of whether the statements involved matters of purely private or public concern, when it held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster...." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). The New York Court of Appeals subsequently held that a private figure plaintiff may successfully bring a defa-

mation suit against a media defendant for statements that are arguably a matter of public concern, if the plaintiff proves that the publisher acted in a grossly irresponsible manner. *Chapadeau v. Utica Observer–Dispatch,* 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975). In contrast, the Pennsylvania Superior Court has held that a private figure plaintiff may recover damages for defamation upon a showing of mere negligence. *Rutt v. Bethlehems Globe Publishing Co.,* 335 Pa.Super.Ct. 163, 484 A.2d 72 (1984). For purposes of this summary judgment motion, this court is persuaded that the Pennsylvania Supreme Court, were it adjudicating this matter, would apply a negligence standard of liability to a private figure plaintiff seeking to recover for defamatory statements which are of public concern.[2]

Because a conflict exists between the laws of New York and Pennsylvania with respect to the appropriate standard of fault in the present case, this court must determine which state has the greater interest in the present dispute. Defendants offer numerous contacts with New York to justify the imposition of New York law, including: (1) defendants Slatalla and Quittner are New York residents who researched and wrote the Book in New York; (2) the principal place of business of defendant HarperCollins is New York; (3) the Book was edited in New York; (4) the Book concerned plaintiffs activities in New York; and (5) the Book discussed plaintiff's affiliation with the New York-based MOD group. (Def Mem. Summ. J., at 29).

Plaintiff contends, *inter alia,* that Pennsylvania has the greater interest in the present dispute because plaintiff is a resident of Pennsylvania and the Book was offered for sale in Pennsylvania. (Pl. Resp., at 30).

The purpose of a defamation suit is to compensate an individual for harm to one's reputation inflicted by a defamatory statement. *Fitzpatrick v. Milky Way Productions, Inc.,* 537 F.Supp. 165, 171 (E.D.Pa. 1982). The state of a plaintiff's domicile is generally the place where most of his reputational contacts are found; therefore, "the state of plaintiff's domicile generally has the greatest concern in vindicating plaintiff's good name and providing compensation for harm caused by the defamatory publication." *Id.* Furthermore, in a defamation suit where the defamatory statements were published in more than one jurisdiction, the state with the significant interest is the domicile of the plaintiff. *See Rome v. Glanton,* 958 F.Supp. 1026, 1034 n. 5 (E.D.Pa.1997); *see also* Restatement (Second) of Conflicts of Law, § 150.

This court is not persuaded by defendants' argument that the decision of the United States District Court for the Western District of Pennsylvania in *Buckley v. McGraw–Hill, Inc.,* 782 F.Supp. 1042 (W.D.Pa.1991), *aff'd* 968 F.2d 12 (3d Cir.1992), is applicable to the present case. In *Buckley,* the court did not apply the law of Pennsylvania, plaintiff's domicile, to decide the controversy presented in that case. *Id.* at 1047–48. *Buckley* is distinguishable from the case at bar,

---

**2.** In *Matus v. Triangle Publications, Inc.,* the Pennsylvania Supreme Court held that to succeed in a claim for defamation, a plaintiff must prove that the defendant published false material with knowledge of falsity or with reckless disregard for the truth. 445 Pa. 384, 286 A.2d 357 (1971), *cert. denied,* 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972). Subsequently, the United States Supreme Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 346, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974), overruled its earlier decisions upon which the *Matus* court had relied in setting the standard of liability in defamation cases. The Court held that a knowing-or-reckless falsity standard was mandated only in cases where the plaintiff was a public official or public figure. *Id.* Furthermore, the Court indicated that as long as the states did not impose a strict liability standard, the states themselves could define the appropriate standard of liability.

*Id.* at 347, 94 S.Ct. at 3011. The Pennsylvania Supreme Court, however, has not ruled on this issue since the *Gertz* decision. The decisions of the state intermediate appellate court on issues on which the Pennsylvania Supreme Court has not yet spoken must be followed by this court, unless this court is convinced by other persuasive data that the Pennsylvania Supreme Court would decide otherwise. *See West v. American Telephone and Telegraph Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183–84, 85 L.Ed. 139 (1940). *See also Kiewit Eastern Co., Inc. v. L & R Constr. Co., Inc.,* 44 F.3d 1194, 1201 n. 16 (3d Cir.1995); *Bradford v. American Media Operations, Inc.,* 882 F.Supp. 1508, 1513 (E.D.Pa.1995). There is no indication that the Pennsylvania Supreme Court would use a different standard than that used by the Superior Court in *Rutt.* Accordingly, that decision sets the standard for this court's analysis.

however, because the *Buckley* court found significant the fact that the plaintiff had not resided in Pennsylvania at the time the defamatory article was published, or at the time he filed his lawsuit, thereby diminishing Pennsylvania's interest in the case. *Id.* In addition, the plaintiff had stipulated to the application of New York law. *Id.* Such factors are not present in the case before this court; therefore, the *Buckley* decision is inapposite to the current controversy. Any harm that may have inured to plaintiffs reputation would have largely centered in Pennsylvania, his domicile. *See Bradford v. American Media Operations, Inc.,* 882 F.Supp. 1508, 1513 (E.D.Pa.1995). *But see Lamelza v. Bally's Park Place, Inc.* 580 F.Supp. 445, 446–47 (E.D.Pa.1984) (noting that the place of plaintiff's domicile was not dispositive on the choice of law issue because plaintiff's reputation did not suffer injury in the state of domicile). Accordingly, Pennsylvania has the greater interest in protecting the reputation of its domiciliary and its law applies to the present action.

### B. *Capable of Defamatory Meaning*

In order to recover on a claim of defamation under Pennsylvania law, a plaintiff must prove, when the issue is properly raised: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff, (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa. Cons.Stat. Ann. § 8343(a)(1)–(7). In their motion for summary judgment, defendants argue that several of the alleged defamatory statements are incapable of defamatory meaning, that there is no genuine issue of material fact whether some of the statements are substantially true, and there is no genuine issue of material fact whether the defendants acted in a negligent manner.

■ The court must examine each of the alleged statements to determine if they are capable of defamatory meaning. *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 442, 273

A.2d 899, 904 (1971). A defamatory communication is one that tends to "harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating with him." *Id.* Accord *United States Healthcare v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 923 (3d Cir.), *cert denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *Clemente v. Espinosa,* 749 F.Supp. 672, 676 (E.D.Pa.1990). The court must interpret the statement within its context to determine whether it had defamatory meaning. *Baker v. Lafayette College,* 516 Pa. 291, 296, 532 A.2d 399, 402 (1987). The Pennsylvania Supreme Court enunciated the test as "the effect the [statement] is fairly calculated to produce, the impression it would naturally engender in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them." *Corabi,* 441 Pa. at 447, 273 A.2d at 904. "However, the fact that the challenged statements may annoy or embarrass a person is not sufficient as a matter of law to create an action in defamation. Injury to reputation is judged by the reaction of other persons in the community and not by the party's self-estimation." *Dougherty v. Boyertown Times,* 377 Pa.Super.Ct. 462, 472–73, 547 A.2d 778, 783 (1988) (citations omitted). If the court deems a statement capable of defamatory meaning, the jury must determine if recipients of the communication have understood it to be defamatory. *Corabi,* 441 Pa. at 442, 273 A.2d at 904; *Rutt v. Bethlehems Globe Publishing Co.,* 335 Pa.Super.Ct. 163, 172, 484 A.2d 72, 76 (1984).

#### 1. *Statements Relating to the Eye Center Computer ("Passage No. 1")*

■ Plaintiff first asserts as defamatory the description in the Book of a scheme hatched by several MOD members to program a private computer in a retail establishment, called the Eye Center, to locate long-distance calling card numbers for the private use of the MOD members. The passage implies that plaintiff benefitted from the illegal scheme of which he was a significant part, and could easily expose plaintiff to ha-

tred, contempt, or to aversion. This court concludes that these statements are capable of defamatory meaning.

### 2. Statements Relating to the Crash of the Learning Link Computer ("Passage No. 2")

◼ Plaintiff next contends that the statements in the Book concerning the crash of the Learning Link computer system are defamatory. The Learning Link is a collection of bulletin boards that is owned by Channel 13/WNET, New York City's public broadcasting television station. (Quittner Aff., ¶ 23). The Learning Link provides a means for schoolteachers and students throughout the New York, New Jersey, and Connecticut region to communicate with each other. *Id.* The Book implies that the Learning Link system crashed after certain members of MOD had entered the system without authorization. (Book, at 96–97). A conclusion may fairly be drawn from the passage that plaintiff was somehow involved in the crash of the system. Read in the context of the Book, the reader of the passage is left with the impression that the crash of the Learning Link system was an event of significant magnitude. An implication that plaintiff took part in such an event exposes plaintiff to hatred, contempt, or aversion, and is capable of defamatory meaning.

### 3. Statements Relating to the January, 1990 Searches of MOD Members' Homes ("Passage No, 3")

◼ The passage in the Book to which the plaintiff next objects concerns an attempted search of plaintiff's home, and/or questioning of plaintiff, by federal agents. The Book states that, in January 1990, after the homes of other MOD members were searched, federal officials visited plaintiff's home. (Book, at 122). Because the government may not conduct a search absent some showing of probable cause, the statement that federal agents attempted to search plaintiff's home carries with it a strong negative connotation. The average reader could conclude that the search of one's home by federal agents casts plaintiff in a negative

light, such that plaintiff was exposed to hatred, contempt, or aversion. This passage, therefore, is capable of defaming plaintiff.

### 4. Statements Relating to the 2600 Meeting and the Tower Book Store Incident ("Passage No. 4")

◼ Plaintiff also contends that passages in the Book that relate to plaintiff's activities when he visited New York are defamatory. The Book states that members of MOD, including plaintiff, met at the Citicorp building for a meeting organized by the magazine *2600.* At the meeting, the MOD members simultaneously called the 800 number of a company that specialized in investigating breaches of computer security, thereby crippling the 800 line. Such statements are capable of being defamatory since the reader could reasonably draw the inference that plaintiff placed the prank phone calls. The Book also relates an incident that occurred after the meeting in which plaintiff used a device to place a call from an internal phone in a Tower Books store. The device described in the Book is a red box, an illegal device. The statements lead the reader to believe that plaintiff was involved in activities that were intended for disruptive purposes, or were illegal. Both passages, therefore, are capable of defamatory meaning.

### 5. Statements Relating to the Dot–Annoy Computer Program ("Passage No. 5")

◼ Plaintiff also labels as defamatory a passage in the Book that describes a particular program that utilized plaintiff's computer. The program, known as "dot-annoy" was designed to continuously dial a telephone number in an endless loop. (Quittner Aff., at ¶ 31). In effect, the telephone of the individual whose number was subject to˙ the dot-annoy would continuously ring, unless the telephone was taken off of the hook, or the individual sought assistance from the telephone company. *Id.* The Book also reports that MOD members would run the dot-annoy program over holiday weekends when the telephone company was closed, in order to better harass their victims. The passage at issue here describes the dot-annoy program in detail, illustrating the manner in which the

program was implemented. The Book implicates plaintiff in the creation and use of the dot-annoy program. Because the program, as its name suggests, was used to harass and annoy the individuals to which the program was applied, a statement connecting plaintiff with the creation and use of the program is clearly susceptible of defamatory meaning.

### 6. Statements Relating to Unauthorized Access of Computer Systems of Credit Reporting Services ("Passage No. 6")

■ Also capable of defamatory meaning is the passage pertaining to MOD's access to the computers of information and credit reporting services such as Information America, TRW, and Trans Union. This particular passage relates how several members of MOD, including plaintiff, sought ways to access the TRW computer system, and implies that the members of MOD altered credit reports. The implication that plaintiff altered credit reports surely exposes plaintiff to hatred, contempt, and aversion, as well as disparages plaintiff's conduct in his profession.

### 7. Statements Relating to the Wrongful Acquisition of Laptop Computers and E-mail Messages ("Passage No. 7")

■ Plaintiff objects to the passage in the Book that describes a search of plaintiff's home by the Secret Service. Specifically, the passage notes that the search warrant indicated that the federal authorities had information that plaintiff had stolen two laptop computers, and that plaintiff had stolen e-mail messages intended for another individual. These statements can reasonably be construed to imply that plaintiff was engaged in illegal activity. The statements are capable of harming plaintiff's reputation so as to lower him in the estimation of the community, or to deter third persons from associating or dealing with him. The statements, therefore, are capable of defamatory meaning.

### 8. Statements Relating to the Criminal Proceedings and Wilson's Cooperation with Law Enforcement Officials ("Passage No. 8")

■ Plaintiff also contends that the Book contains defamatory passages concerning his cooperation with law enforcement officials in the criminal case against several of the MOD members, and the fact that plaintiff ultimately was not sentenced to jail for his activities. To the extent that the passage implies that plaintiff cooperated with federal officials to escape punishment himself, this statement is capable of defamatory meaning. An average reader could construe the passage as implying that plaintiff unjustifiably was not sentenced to jail for his participation in illegal activities. Such statements expose plaintiff to hatred, contempt, or aversion and are capable of defamatory meaning.

### 9. Statements Relating to Wilson's Possible Involvement in Group Known as The Posse ("Passage No. 9")

■ plaintiff objects as defamatory to a passage in the Book that refers to a group of computer hackers known as The Posse, and the government's questioning of plaintiff for possible involvement in that group. A fair reading of this passage could lead the reader to believe that plaintiff continues to participate in illegal hacking activities. Such participation exposes the plaintiff to hatred, aversion, or contempt, and is capable of defamatory meaning. In addition, such a statement could tend to disparage plaintiff's conduct in his profession. Thus, this court finds that all nine passages alleged by plaintiff to be defamatory are all capable of defamatory meaning.

### C. Fair Report Privilege

■ Defendants also seek summary judgment on the grounds that several of the alleged defamatory passages are covered by the fair report privilege. The Third Circuit summarized the privilege as follows:

> The fair report privilege . . . developed as an exception to the common law rule that the republisher of a defamation was subject to liability similar to that risked by the original defamer. Pennsylvania had adopted the republication rule by the turn of the century, and no case brought to our attention suggests that Pennsylvania has abandoned it. With this rule, the law indulged the fiction that the republisher of a

defamatory statement "adopted" the statement as his own. This common law regime created special problems for the press. When a newspaper published a newsworthy account of one person's defamation of another, it was, by virtue of the republication rule, charged with publication of the underlying defamation. Thus, although the common law exonerated one who published a defamation as long as the statement was true, a newspaper in these circumstances traditionally could avail itself of the truth defense only if the truth of the underlying defamation were established.

To ameliorate the chilling effect on the reporting of newsworthy events occasioned by the combined effect of the republication rule and truth defense, the law has long recognized a privilege for the press to publish accounts of official proceedings or reports even when these contain defamatory statements. So long as the account presents a fair and accurate summary of the proceedings, the law abandons the assumption that the reporter adopts the defamatory remarks as his own. The privilege thus permits a newspaper or other press defendant to relieve itself of liability without establishing the truth of the substance of the statement reported.

*Medico v. Time, Inc.*, 643 F.2d 134, 137–38 (3d Cir.) (footnotes and citations omitted), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981).[3] The burden is on the defendant to first establish the existence of the privileged occasion. *Oweida v. Tribune–Review Publishing Co.*, 410 Pa.Super.Ct. 112, 121, 599 A.2d 230, 235 (1991). The trial court must then determine whether the occasion

upon which the defendant published the defamatory matter gives rise to a privilege. *Id.* (citing Restatement (Second) of Torts, § 619(1)). Once the existence of the privilege is established, the jury must determine whether the privilege was abused. *Id.* "The question of whether the fair report privilege has been abused has been distilled by the federal courts to a 'gist' or a 'sting' test. A statement is substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *Id.* at 129, 599 A.2d at 239; *Mosely v. Observer Publishing Co.*, 427 Pa.Super.Ct. 471, 479–80, 629 A.2d 965, 969 (1993). "If the reader could conclude that the [allegedly defamatory publication] carries with it a materially greater 'sting', then the fair report privilege has been abused and is thus forfeited." *Mosely,* 427 Pa.Super.Ct. at 480, 629 A.2d at 969. The plaintiff may also prove that the privilege was abused by showing that the account was published solely for the purpose of causing harm to the person defamed. *See Sciandra v. Lynett,* 409 Pa. 595, 600, 187 A.2d 586, 589 (1963); *Medico,* 643 F.2d at 146; *Friedman v. Israel Labour Party,* 957 F.Supp. 701, 709 (E.D.Pa.1997).

1. *Statements Relating to the Eye Center Computer ("Passage No. 1")*

Defendants contend that the statements in the Book relating to the Eye Center incident are covered by the fair report privilege because the information was taken from: (1) the presentence report of Elias Ladopoulos (of one of the MOD members who was prosecuted in New York) prepared by the United States Probation Department, (Quitt-

**3.** The Third Circuit noted that case law is unclear whether the privilege is available to nonpress defendants. *Medico,* 643 F.2d at 137 n. 9. In light of the identity of the defendant in that case, Time, Inc., the court did not need to decide whether Pennsylvania would allow non-media defendants to claim the privilege. *Id.* In the case at bar, it is unclear whether the defendants are members of the press. This court concludes that Pennsylvania would allow the defendants to claim the privilege. The alleged defamatory passages are contained in the Book which was written in a non-fiction format. Arguably, the defendants, as authors, were acting to disseminate information to the public and should fall within

the ambit of the privilege. Furthermore, in *Medico,* the Third Circuit noted that Pennsylvania had not yet codified the fair report privilege, and accepted as the law of Pennsylvania the version of the fair report privilege embodied in the Restatement (Second) of Torts. *Id.* at 138. Comment (c) of the Restatement which addresses the parties who may claim the privilege, states that the privilege is not to be limited to newspapers or broadcasters, but "extends to any person who makes an oral, written, or printed report to on the information that is available to the general public." Restatement (Second) of Torts § 611, Comment (c).

ner Aff, Exhibit G); (2) an October 29, 1993 letter from Assistant United States Attorney ("AUSA") Geoffrey S. Berman to the Honorable Louis L. Stanton of the United Stated District Court for the Southern District of New York regarding the sentencing of Mark Abene, one of the members of MOD, (Quittner Aff., Exhibit H); and (3) the "History of MOD", a document written by Ladopoulos, annexed as an exhibit to the July 26, 1993 letter from AUSA Berman to the Honorable Richard Owen of the United States District Court for the Southern District of New York concerning the sentencing of Ladopoulos, (Quittner Aff., Exhibit I). Defendants proffer that the Eye Center scheme, as recounted in the Book, is a substantially accurate account of the information contained in the above referenced documents. (Def. Mem. Summ. J., at 32–33). They further suggest that to the extent the account in the Book differs from that of the government documents, the Book does not alter the gist or the sting of the information in the reports, (Def. Mem. Summ. J., at 33), implying that any privilege that might apply to the Eye Center passage has not been abused.

The documents upon which the defendants relied to gather information for the Eye Center passage do qualify as official government documents for purposes of the fair report privilege. First, the presentence report of Ladopoulos in the present case is analogous to the FBI reports analyzed by the Third Circuit in *Medico*. In that case, the court affirmed the district court's determination that the FBI reports were "official" reports for purposes of the fair report privilege, despite the fact that the FBI reports were not made available to the general public. *Medico*, 643 F.2d at 139. Furthermore, the court was not persuaded by the plaintiff's argument that the FBI reports did not constitute official reports because they expressed "only tentative and preliminary conclusions" that the FBI had never adopted as accurate. *Id.* Rather, the *Medico* court decided that the FBI reports were "official", in part because they were prepared by government officials acting in their official capacities. *Id.* at 140. In addition, the Third Circuit found the idea that public scrutiny of federal agencies could have the effect of encouraging social respon-

sibility amongst those who enforce the laws, and the concept that the public has an interest in learning of important matters, supported a finding that the FBI reports at issue in the case were properly covered by the privilege. *Id.* at 141–43. Similarly, such an analysis is applicable to the case at bar. The presentence report of Ladopoulos can be considered an official report of the United States Probation Department, for it was prepared by government agents acting in their official capacity. In addition, the public scrutiny rationale and the public's interest in the sentencing of convicted criminals support the application of the privilege to the presentence report.

Second, applying the *Medico* rationale to the letter from AUSA Berman to Judge Stanton and the letter from AUSA Berman to Judge Owen, this court concludes that for purposes of the fair report privilege, these documents constitute official government documents. Correspondingly, the History of MOD, attached as an exhibit to the letter from AUSA Berman to Judge Owen constitutes an official document from which information gleaned is covered by the fair report privilege. Although it is not clear from the record before this court whether the letters submitted to the court were filed as part of the official court file, it is clear that the letters were reports made to the court in the course of a judicial proceeding. *See* Restatement (Second) of Torts § 611, Comments (d), (e). The letter to Judge Owen, dated July 26, 1993, was sent in connection with the sentencing of Ladopoulos and summarizes for the court the prosecution's position with respect to the appropriate sentence for Ladopoulos. In addition, the letter to Judge Stanton, dated October 29, 1993, was written in connection with the sentencing of Abene, and appears to have a similar purpose. Furthermore, the application of the privilege to the letters that the AUSA sent to the court, is consistent with the rationale that the fair report privilege serves a supervisory function "which recognizes both the public's duty to scrutinize official conduct and the security which publicity gives to the proper administration of justice." *See Mosely*, 427 Pa.Super.Ct. at 478, 629 A.2d at 968.

This court, therefore, concludes that the fair report privilege applies to the Eye Center passage. A genuine issue of material fact remains, however, whether the privilege was abused with respect to this passage. The record contains sufficient evidence for a jury to conclude that the authors inaccurately related the number of occasions that the MOD members used the telephone calling card numbers obtained from the Eye Center's computer system. *See* Quittner Aff., Exhibit H, at pp. 6–7; *id.*, Exhibit G, at pp. 10–11. A jury could also find that the authors inaccurately reported that the MOD members rigged plaintiff's computer to automatically page Ladopoulos whenever a telephone card number was obtained. *See* Pl. Resp., at 15; Pl. Resp., Exhibit O (Ladopoulos Depo.), at 39–40. The jury must decide, therefore, whether the privilege was abused with respect to the Eye Center passage.

2. *Statements Relating to the January, 1990 Searches of MOD Members' Homes ("Passage No. 3")*

Defendants also assert that the passage relating to the January 1990 search of the homes of several of the MOD members is privileged because the information was taken from the History of MOD, which was attached as an exhibit to the July 26, 1993 letter from AUSA Berman to Judge Owen. As this court indicated above, the information contained in the History of MOD is covered by the fair report privilege. For those same reasons, the passage relating to the January 1990 search of the MOD members' homes is also covered by the privilege.

There exists no genuine issue of material fact, however, whether defendants have abused the privilege with respect to the passage concerning the 1990 search of the MOD members homes. The Book quotes directly from the History of MOD. *Compare* Book at

122; *with* Quittner Aff, Exhibit I (containing History of MOD). This court concludes, therefore, that defendants fairly and accurately related the information contained in the History of MOD. In other words, defendants' version of the 1990 search of the MOD members' homes did not embellish the History of MOD version of the incident. Furthermore, plaintiff has produced no evidence showing that defendants published the Book, or included this passage in the Book, for the sole purpose of causing harm to plaintiff. Granted, plaintiff's response to the motion for summary judgment is replete with allegations that the authors acted maliciously in their references to plaintiff and that the authors intended to harm the plaintiff via the Book. However, plaintiff has presented no evidence to this end. This court will, therefore, grant defendants' motion for summary judgment with respect to the alleged defamation caused by the passage relating to the 1990 search of the MOD members' homes on the basis that the passage is covered by the fair report privilege, and that no genuine issue of material fact exists whether defendants abused this privilege. *See Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 511 (3d Cir.1994) (noting the "non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact").

3. *Statements Relating to Unauthorized Access of Computer Systems of Credit Reporting Services ("Passage No. 6")*

Defendants aver that the passage relating to the unauthorized access of the computer systems of credit reporting services falls under the fair report privilege because the information in the passage was based directly on a transcript of a wiretapped telephone conversation between plaintiff and another member of MOD.[4] (Def. Mem. Summ. J., at

---

4. Defendants also contend that this particular passage is privileged because the wiretapped conversations were referenced in a search warrant application, and the October 29, 1993 letter from AUSA Berman to Judge Stanton. (Def. Mem. Summ. J., at 34–35). However, such references are irrelevant for purposes of this court's analysis of the fair report privilege. Because those documents contain only *references* to the transcripts, and not the substance of the transcripts, the defendants may not rely upon the letter and the search warrant affidavit as documents from which the substance of the wiretap conversations was gathered. This court, therefore, will not analyze further the applicability of the privilege to these documents with respect to the wiretap conversations.

34). The transcript was attached as an exhibit to a letter dated August 5, 1992 from AUSA Stephen Fishbein to the attorneys of the MOD members who were prosecuted in the Southern District of New York. *Id.*

■ For purposes of determining the applicability of the fair report privilege to the particular passage at issue here, the August 5, 1992 letter from AUSA Fishbein and wiretap transcripts attached thereto, do constitute reports made in the course of an official proceeding. The August 5, 1992 letter was written in connection with the prosecution of the indicted members of MOD. *See* Quittner Aff., Exhibit G, at p. 2 (Presentence Report of Ladopoulos indicating indictment filed July 8, 1992). Pursuant to Fed.R.Crim.P. 16(a), as part of the discovery process, the government was under a duty to disclose, and make available, to the defendants the transcripts of the wiretap conversations. Plaintiff has not shown that the drafts of the transcripts are unreliable. The document upon which defendants relied to gather information was prepared by the government in connection with a criminal prosecution. The letter, with attachments, therefore, falls within the ambit of the fair report privilege.[5]

■ Upon review of the particular passage in the Book that pertains to the credit reports and the wiretap transcripts themselves, this court concludes that the passage is covered by the fair report privilege, but a genuine issue of material fact remains whether the defendants abused this privilege by embellishing the information taken from the wiretap conversation in the Book's version of the episode. *Compare* Book at 185, *with* Quittner Aff., Exhibit M, at Bates-stamp 235–36.

### 4. *Statements Relating to the Wrongful Acquisition of Laptop Computers and E-mail Messages ("Passage No. 7")*

Finally, defendants contend that the statements relating to the wrongful acquisition of

laptop computers and e-mail messages by plaintiff are privileged because the passage is based on the affidavit of Special Agent Richard Harris of the United States Secret Service, submitted to a court in support of a search warrant application. (Def. Mem. Summ. J., at 35–37).

■ The Superior Court of Pennsylvania held in *Mosely v. Observer Publishing Co.,* that a public newspaper was privileged to publish information of public concern contained in an affidavit for a search warrant so long as the report was fair and accurate. 427 Pa.Super.Ct. 471, 473, 629 A.2d 965, 966 (1993). The court noted that the extension of the privilege to an affidavit in support of a search warrant was appropriate since it was in the public interest. *Id.* at 478, 629 A.2d at 969. In its application of the privilege, the court relied upon a decision of the Pennsylvania Supreme Court which stated, "[p]ublic access to arrest warrant affidavits foster important policy considerations, such as discouraging perjury, enhancing police and prosecutorial performance, and promoting a public perception of fairness in the arrest warrant process." *Id.* at 478–79, 629 A.2d at 969 (quoting *PG Publishing Co. v. Commonwealth,* 532 Pa. 1, 5, 614 A.2d 1106, 1108 (1992)). The Superior Court also indicated that the courts of other jurisdictions have similarly held the privilege applicable to information contained in search warrants and affidavits for search warrants used in public investigations. *Id.* at 479, 629 A.2d 965.

■ This court concludes, therefore, that the fair report privilege extends to the passage based on the affidavit of Special Agent Harris in support of the search warrant application. Plaintiff has presented evidence, however, creating a genuine issue of material fact as to whether the passage in the Book is a fair and accurate report of the information that defendants contend is contained in the search warrant affidavit of Special Agent

---

5. Plaintiff contends that the wiretap transcripts should not fall under the fair report privilege because the transcripts are merely drafts of the wiretap conversations. (Pa. Resp., at 41). As indicated above, the Third Circuit in *Medico* found unpersuasive the plaintiff's argument that the FBI reports at issue in that case were not covered by the fair report privilege, because the reports expressed "only tentative and preliminary conclusions that the FBI has never adopted as accurate." *Medico,* 643 F.2d at 139. In light of the Third Circuit's finding in *Medico,* this court is unpersuaded by plaintiff's argument.

Harris. Arguably, the Book implies that the search of plaintiff's home was conducted pursuant to Special Agent Harris' search warrant application, when in fact, that application pertained to a property in the Southern District of New York. *See* Book at 201; Quittner Aff., Exhibit J, at Bates-stamp 189, 207. A separate search warrant was signed to conduct a search of plaintiff's home. (Pl. Resp., Exhibit C). That warrant application and rider in support thereof, however, do not contain the same information as the information contained in the warrant application of Special Agent Harris. *Id.* A genuine issue of material fact exists, therefore, whether the defendants abused the fair report privilege with respect to their reliance on the affidavit of Special Agent Harris.

### D. *Substantial Truth of Alleged Defamatory Statements*

The defendants have also raised the issue of the falsity of several of the statements in their motion for summary judgment. That is, the defendants claim that several of the statements at issue cannot be deemed defamatory because they are true, or substantially true. (Def. Mem. Summ. J., at 37–46; Supp. Def. Mem. Summ. J., at 14–24).

Generally, Pennsylvania had applied the common law presumption that defamatory speech is false, thereby placing the burden on the defendant to prove the veracity of the statements that are the center of the controversy. The United States Supreme Court, however, negated this presumption at least in defamation cases in which the alleged defamatory statements are matters of public concern. In *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776, 106 S.Ct. 1558, 1563–64, 89 L.Ed.2d 783 (1986), the Supreme Court held that in a defamation action where the alleged defamatory statements are a matter of public concern, the plaintiff must prove fault on the part of the defendants, as well as the falsity of the allegedly defamatory statements. This holding contradicted the common law rule on falsity—that the defendant bears the burden of proving truth in a defamation action. *Id.* Since the *Hepps* decision was rendered, both state and federal courts have applied the *Hepps* analysis. *See e.g.,*

*Waters v. Churchill*, 511 U.S. 661, 669, 114 S.Ct. 1878, 1884–85, 128 L.Ed.2d 686 (1994) (noting in dicta that libel plaintiff must bear the burden of proving that speech is false); *Hatchard v. Westinghouse Broadcasting Co.*, 516 Pa. 184, 190, 532 A.2d 346, 349 (1987) (citing *Hepps* for the proposition that "the First Amendment precludes a state from imposing on a media defendant the burden of proving the truth of a defamatory statement; proof of falsity thus [is] an additional element of the plaintiff's case"); *United States Health Care v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 923 n. 10 (3d Cir.) (noting in private plaintiff-public issue defamation action against media defendant, there is constitutional requirement to prove falsity of the speech at issue), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *Bobb v. Kraybill*, 354 Pa.Super.Ct. 361, 366 n. 3, 511 A.2d 1379, 1381 n. 3 (1986) ("The United States Supreme Court has recently held that whether a plaintiff in a defamation action is a private or public figure, the burden of proving falsity is on the plaintiff."), *appeal denied,* 513 Pa. 633, 520 A.2d 1384 (1987); *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 919 F.Supp. 756, 763 (D.N.J.1996) (stating that a plaintiff bears the burden of proof as to falsity and malice if the defamatory statement addresses an issue of public concern). Because defendants have raised the issue of truth at this stage of the litigation, this court must analyze whether through his response and submissions, plaintiff has created a genuine issue of material fact as to falsity such that summary judgment may not be entered against plaintiff.

### 1. *Statements Relating to the Eye Center Computer ("Passage No. 1")*

Defendants contend that the statements relating to the Eye Center are also not actionable because they are substantially true. (Def. Mem. Summ. J., at 38–39; Supp. Def. Summ. J., at 14–15). Defendants offer in support of this contention plaintiff's statements at his deposition, in which he admitted making phone calls and charging the calls to another person's telephone account on at least more than one hundred occasions.

(Wilson Depo., at 111). The Book states that the Eye Center computer scheme generated 150 valid calling card numbers for the use of the members of MOD. (Book, at 74). Defendants maintain that they obtained this figure from Paul Stira, another member of MOD. (Quittner Aff., ¶ 22). In addition, defendants note that plaintiff did admit "getting numbers", but indicated that he did not "know if they were calling card numbers or not." (Wilson Depo., at 413–14, 419). Defendants also point to the fact that plaintiff stated at his deposition that it was possible that they had rigged his computer to dial Ladopoulos' beeper with each new calling card number. (Wilson Depo., at 423). It is also the defendants' contention that Ladopoulos had informed the authors that the MOD members had rigged plaintiff's computer in such a way. (Quittner Aff., ¶ 22).

■■■■ record contains evidence, however, creating a genuine issue of material fact as to the veracity of the Eye Center scheme as told by the defendants in the Book. The documents upon which the defendants relied to gather information about the Eye Center scheme, as indicated in their argument with respect to the fair report privilege, do not support the statement that plaintiff and Stira obtained 150 calling card numbers. *See* Quittner Aff, Exhibit H, at pp. 6–7; *id.,* Exhibit G, at pp. 10–11. Plaintiff also denied any knowledge of a place called the Eye Center, and contrary to the passage in the Book, stated that he had never obtained eyeglasses there. (Wilson Depo., at 417, 424). Furthermore, in his deposition, Ladopoulos did not endorse the statement that the MOD boys had rigged plaintiff's computer to page Ladopoulos when each new card number was obtained. (Pl. Resp., Exhibit O (Ladopoulos Depo.), at 39–40). This court cannot say that plaintiff "did not and could not sustain his burden of proving the statements false and that there is *no possibility* of a legally sustainable verdict in his favor." *See Bobb,* 354 Pa.Super. at 366, 511 A.2d at 1381 (emphasis added). The court, therefore, will deny defendants' motion on the falsity issue, with respect to the Eye Center passage.

2. *Statements Relating to the Crash of the Learning Link Computer ("Passage No. 2")*

■■■■ Defendants also contend that the passage of the Book relating to the crash of the Learning Link is true, or substantially true. Defendants aver that the information concerning this passage was based on a conversation they had with Stira. (Quittner Aff, ¶ 24). Stira confirmed at his deposition that the Book's rendition of the incident was accurate. (Metcalf Aff, Exhibit D, at 61). Defendants offer as further support for their position, a January 24, 1990 affidavit of Ladopoulos in which he indicates that plaintiff accessed the Learning Link computer system. (Quittner Aff, Exhibit L, at Bates-stamp 435). However, when questioned at his deposition about the crash of the Learning Link computer system, plaintiff denied any involvement in the incident and stated that he had no recollection of the purported phone call with Ladopoulos and Stira. (Wilson Depo., at 428). Sufficient evidence in the record exists, therefore, creating a genuine issue of material fact as to the veracity of the passage concerning the crash of the Learning Link computer system.

3. *Statements Relating to the January, 1990 Searches of MOD Members' Homes ("Passage No. 3")*

In the supplemental memorandum in support of their motion for summary judgment defendants also aver that the passage relating to the 1990 searches of the MOD members' homes is not actionable because it is substantially true. (Supp. Def. Mem. Summ. J., at 16). The court need not reach this question, however, because the court has already determined that the passage is covered by the fair report privilege, and that it cannot be said that the privilege was abused by defendants. Summary judgment is granted in defendants' favor on those grounds.

4. *Statements Relating to the 2600 Meeting and the Tower Book Store Incident ("Passage No. 4")*

■■■■ First, defendants argue that the statements relating to the *2600* meeting and the prank phone calls to Comsec's 800 phone

number are true.[6] (Def. Mem. Summ. J., at 40–41; Supp. Def. Mem. Summ. J., at 16–17). Defendants note that plaintiff admitted that he attended the meetings in New York. (Wilson Depo., at 431–33). Stira confirmed that he recalled seeing plaintiff at these meetings on two or three occasions. (Metcalf Aff., Exhibit D, at 18). He also confirmed the fact that several people at the meeting had placed prank calls to Comsec's 800 number, although Stira also indicated that only three people had placed the calls. *Id.* at 35. In plaintiff's response to the defendants' motion for summary judgment, he does not directly contest the truth of this portion of the passage. *See* Pl. Resp., at 46–47. In his deposition, however, upon being questioned about whether he recalled calling the Comsec line from the meetings, plaintiff responded that he did not know for certain whether he had called Comsec. (Wilson Depo., at 433). In light of the above evidence, this court concludes that plaintiff has not raised a genuine issue of material fact as to the falsity of the statement that plaintiff was involved in the Comsec incident, and summary judgment is entered in favor of defendants with respect to this portion of passage No. 4.

■ Second, defendants argue that the statements in this passage that relate to the Tower Book store incident are not actionable because they are substantially true. (Def. Mem. Summ. J., at 41–42). Defendants based the passage on information gathered in interviews with Stira and Eric Corley, publisher of *2600* magazine. (Quittner Aff, ¶¶ 29–30). Stira confirmed at his deposition that he had given the authors information about the Tower Books event. (Metcalf Aff, Exhibit D, at 50). In his deposition, plaintiff admitted placing a call from the Tower Books telephone (Wilson Depo., at 435), but contested the Book's account as to the fact that he coaxed a dial tone out of the receiver. (Wilson Depo., at 434). Plaintiff suggests that the device described in the Book is actually a red box, not a tone dialer as indicated. (Wilson Depo., at 437). Plaintiff fur-

ther avers that a red box is an illegal device, while a tone dialer is not. *Id.* Plaintiff clearly contests the veracity of the incident as recounted by the defendants in the Book. Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to the falsity of this passage; therefore, defendants' motion for summary judgment must be denied with respect to the Tower Books store passage.

### 5. Statements Relating to the Dot–Annoy Computer Program ("Passage No. 5")

■ Defendants have also moved for summary judgment with respect to the passage of the Book that describes the dot-annoy scheme, on the basis that the passage is true or substantially true. (Def. Mem. Summ. J., at 42–45; Supp. Def. Mem. Summ. J., at 18–19). Defendants point out that plaintiff admitted using the dot-annoy program, possibly more than one hundred times. (Wilson Depo., at 354–55). Plaintiff also admitted executing the Mr. Ed version of the program on a remote computer at least ten times, admitted that he had recorded the theme music himself, (Wilson Depo., at 453–54), and that he executed the program for his friends upon their request. (Wilson Depo., at 362, 355, 443, 455–56). At his deposition, plaintiff did not deny the fact that the MOD members had pranked someone with whom plaintiff had been friends when they were Boy Scouts. (Wilson Depo., at 456–57). This individual, Thomas Woolman, confirmed at his deposition that he had received prank telephone calls of the nature generated by the dot-annoy program, from a person whom he believed to be plaintiff, and from persons purporting to be plaintiff's friends. (Metcalf Aff., Exhibit H, at 31–38).

In the passage about the dot-annoy program, the Book also refers to Modnet, a bulletin board allegedly set up by plaintiff (Book, at 165). On this bulletin board, the members of MOD purportedly maintained a database of personal information about other computer hackers. (Book, at 165). Defen-

---

6. The court is unpersuaded by defendants' argument that this portion of the passage is also not actionable because it is not "of and concerning" the plaintiff (Def. Mem. Summ. J., at 41). Read

in the context of the passage, the reader could infer that plaintiff was involved in the Comsec incident.

dants suggest that they learned of the existence of the bulletin board through Special Agent Harris' affidavit in support of a search warrant. (Quittner Aff., ¶ 33). In addition, they had a computer printout that confirmed the existence of Modnet. *Id.* Plaintiff confirmed that he ran a Unix system called Modnet from his home. (Wilson Depo., at 323–34). This fact was also confirmed by Stira at his deposition. (Metcalf Aff., Exhibit D, at 21, 73). In addition, defendants proffer that they were informed by one of the members of MOD about the database maintained on the bulletin board which contained personal information about other hackers. (Quittner Aff., at ¶ 34). Defendants were also informed by Stira that plaintiff had written the particular dot-annoy program at issue, and that a target of the prank was Thomas Woolman. (Quittner Aff, at ¶ 34; Metcalf Aff., Exhibit D, at 65, 68).

Plaintiff has not presented sufficient evidence to create a genuine issue of material fact with respect to the falsity of the dot-annoy program. In support of his argument that summary judgment is not proper on this issue, plaintiff offers as evidence of the falsity of the passage, the fact that a disk was found in the possession of Stira by the Secret Service which contained the password "Woolman," thereby implicating Stira in the dot-annoy pranks. (Pl. Resp., at 47). Plaintiff concludes that such information should have made the defendants suspicious of the information they gathered about the pranks from Stira. *Id.* Such evidence itself, however, does not create a genuine issue of material fact as to the falsity of the dot-annoy passage. At his deposition, the plaintiff did allege that the passage about the dot-annoy program was false. For example, plaintiff denied writing the original dot-annoy program. (Wilson Depo., at 353). Plaintiff also contested several technical aspects of the passage. (Wilson Depo., at 353–62). Plaintiff contested the statement that the dot-annoy program was run through his Apple computer because he would not have wanted his phone line tied up, nor his computer used for that purpose, but that the program was run through other computers, (Wilson Depo., at 442–43); plaintiff also contested the defendants' technical analysis and description of

the dot-annoy program itself, (Wilson Depo., at 445–49); and plaintiff corrected that the database of names and information about other hackers was maintained on his Unix computer, not his Apple computer, (Wilson Depo., at 449–50). Such contentions do not create genuine issue of *material* facts sufficient to support plaintiff's position that the passage is false. Summary judgment is, therefore, granted in defendants' favor with respect to this passage.

6. *Statements Relating to the Criminal Proceedings and Wilson's Cooperation with Law Enforcement Officials ("Passage No. 8")*

■ Defendants also have moved for summary judgment on the issue of falsity with respect to the passage relating to the criminal proceedings and plaintiff's cooperation with law enforcement officials. (Def. Mem. Summ. J., at 45–46; Supp. Def. Mem. Summ. J., at 22). Defendants offer in support of this contention the fact that plaintiff admitted in his deposition that he made trips from Pennsylvania to Manhattan to meet with representatives of the United States Attorney's Office, that he had legal representation during the time period that he was cooperating with federal officials, that he did testify in front of a grand jury, and that neither he, nor Julio Fernandez, another member of MOD, received jail sentences. (Wilson Depo., at 258, 465–68). Special Agent Harris confirmed the fact that plaintiff, indeed, cooperated with the government in the prosecution of the MOD members, and that Stira, Abene, Ladopoulos, and John Lee (the indicted members of MOD), all received jail sentences for their illegal computer activities. (Metcalf Aff., Exhibit G, at 35–40, 42–43).

Plaintiff's primary contention with this passage is that it paints him in a negative light. In his response to defendants' motion for summary judgment, plaintiff alleges that this passage is false, yet, he has adduced no evidence to support that allegation. (Pl. Resp., at 48). On the contrary, plaintiff's admissions at his deposition belie such a contention. *See* Wilson Depo., at 210–47, 258, 465–68. Again, the standard under

which this court must analyze the present question dictates that the "non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact," *Pastore v. Bell Telephone Co. of Pennsylvania*, 24 F.3d 508, 511 (3d Cir.1994). In light of this standard, the court concludes that plaintiff has not met his burden with respect to defendants' motion for summary judgment concerning this passage, and summary judgment is granted in favor of defendants with respect to this passage.

### E. Liability of Defendants

[38] Finally, defendants maintain that they are entitled to summary judgment because there is no genuine issue of material fact with respect to the fault of the defendants. They move this court to find that they were not negligent as a matter of law. (Def. Mem. Summ. J., at 54–57; Supp. Def. Mem. Summ. J., at 23–24). Applying Pennsylvania law to this case, genuine issues of material fact exist, however, as to whether the defendants are liable for defamation under the appropriate standard of liability. In a defamation action, "[n]egligence is a question for the jury to determine upon proper instruction. The court should not remove the question from the jury unless the facts leave no room for doubt." *Dougherty v. Boyertown Times*, 377 Pa.Super.Ct. 462, 481, 547 A.2d 778, 787 (1988). Moreover, because the reasonableness of a defendant's action is often in dispute, summary judgment is rarely appropriate in a negligence action. *See generally*, 10A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 2729 (1983).[7]

---

7. Defendants also argue that HarperCollins, a publisher, is entitled to summary judgment on the liability issue. Specifically, defendants note that New York courts have held it not grossly irresponsible for an editor to rely on the integrity of a reputable author. *See Ortiz v. Valdescastilla*, 102 A.D.2d 513, 478 N.Y.S.2d 895 (1st Dept. 1984); *Naantaanbuu v. Abernathy*, 816 F.Supp. 218, 226–28 (S.D.N.Y.1993). Defendants urge this court to predict that Pennsylvania will adopt a rule similar to that of New York, permitting publishers to rely upon the integrity of the author. (Def. Mem. Summ. J., at 60–61).

Furthermore, defendants urge this court to extend the incremental harm doctrine as set forth

Accordingly, for all the above reasons the defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. To the extent that the court denies the defendants' motion, the motion is denied without prejudice to defendants' right to raise these issues again at the conclusion of the plaintiff's case. *See* Fed.R.Civ.P. 50.

under New York law, to the case at bar. (Def.Mem.Summ. J., 61–62). This doctrine protects a defendant in a defamation case from liability for statements, which even if false, are not·capable of causing incremental harm to a plaintiff's reputation beyond the damage caused by true statements. *See Herbert v. Lando*, 781 F.2d 298, 309–12 (2d Cir.), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986). Defendants, however, have not shown that Pennsylvania has adopted, or will adopt, these concepts. Thus, this court will not grant defendants' motion on these grounds.